[No. B195197. Second Dist., Div. Five. Mar. 11, 2010.]

THE PEOPLE, Plaintiff and Respondent, v.
REYAS CONCHA et al., Defendants and Appellants.

COUNSEL

Maria Morrison, under appointment by the Court of Appeal, for Defendant and Appellant Reyas Concha.

Diana M. Teran, under appointment by the Court of Appeal, for Defendant and Appellant Julio Hernandez.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Scott A. Taryle and Stephanie A. Miyoshi, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

MOSK, J.—

## INTRODUCTION

The California Supreme Court held in this case that a defendant who commits an attempted murder may also be liable for first degree murder when his accomplice is killed by the intended victim in the course of the attempted murder. (*People v. Concha* (2009) 47 Cal.4th 653 [101 Cal.Rptr.3d 141, 218 P.3d 660].) But the court concluded that the trial court erred when it failed to instruct the jury that "for a defendant to be found guilty of *first degree murder*, he *personally* had to have acted willfully, deliberately, and with premeditation when he committed the attempted murder." (*Id.* at p. 666.) The Supreme Court remanded the matter to this court to determine whether that instructional error prejudiced defendants and appellants Reyas Concha and Julio Hernandez with respect to their first degree murder convictions. We conclude that it is clear beyond a reasonable doubt a rational jury would have found each defendant personally premeditated and deliberated the attempted murder, so the instructional error was harmless. We therefore affirm the first degree murder convictions.

## FACTUAL BACKGROUND[1]

Jimmy Lee Harris owned the Cindy Lu Beauty Salon located at 4411 South Normandie Avenue, at the corner of Vernon Avenue. At approximately 11:40

---

[1] The facts are taken from our previous opinion in this matter rather than from the Supreme Court's opinion because our more extensive recitation of the facts may be more useful for a harmless error analysis.

p.m. on July 14, 2005, Harris returned to his place of business from dinner. He parked his car in the alley abutting the parking lot behind the business. As Harris opened the driver's door of his car and attempted to exit, two men approached him. When Harris stood up, one of the men was just inches from him, and the other was standing next to the open car door. Harris saw that they were male Hispanics with shaved heads.[2] Harris identified Hernandez as the man closest to him and Concha as the other man. Concha said "Give up the money, Holmes, [sic] or we're gonna kill you[,] and the smokes." He also said something to the effect of "46 Crips." When Harris replied that he did not have any "smokes," Concha repeated the demand for money and the threat to kill him if Harris did not acquiesce.

Harris realized he had "a problem with these guys because those two [Hernandez and Concha] [were] closest and there [were] two more [male Hispanics] maybe eight to ten feet from [him] . . . ." Harris's "main objective was to try to get out of there . . . ." Harris[3] grabbed Concha, pulled him into Hernandez, and attempted to flee, but he encountered the other two male Hispanics. All four male Hispanics attacked Harris in the alley. Harris "fought them off in the alley where they [were] doing a lot of hitting on [him]. And [he] got away from them, and . . . ran into . . . Normandie Avenue."

When Harris ran into Normandie, he thought perhaps his attackers would not follow him, but they did. He ran south down the middle of Normandie, and his attackers pursued him for over a quarter of a mile. Kevin Decoud was near the laundry room of his apartment building on Normandie, smoking a cigarette, when he heard someone cry for help. He went to the gate and saw Harris "zigzagging across [Normandie] . . . hollering for help, trying to get help on his cell phone while three Mexican guys chased him." Harris was running "pretty fast," but was tiring. One of the Hispanic men, whom Decoud identified as Hernandez, was ahead of the other two. The male Hispanics were spaced about five seconds apart. The second one appeared to be holding a brown beer bottle. Sometime later, Decoud observed Hernandez running back down Normandie in the opposite direction holding his side.

Harris ran up to a man and a woman walking south on Normandie and told them that his pursuers were trying to kill him, but that man and woman ran off in a different direction. He ran up to another man at about 48th Street, said the same thing to him, and asked him to call 911, but that man ran off as well.[4] Harris then went to a house on the south side of 48th Street and knocked on the door, but no one answered.

---

[2] The men were about five feet five inches or five feet six inches tall.

[3] Harris was six feet two inches tall and weighed 225 pounds.

[4] What occurred is reminiscent of the widely reported 1964 Kitty Genovese killing observed by a number of witnesses who did nothing to help her. Harris had a cell phone and tried to call 911 himself, but was unsuccessful.

Harris's pursuers were now "closing in on [him] real good," so he ran from the porch and attempted to scale a five-foot fence on the side of the house, but was too tired. His pursuers caught up to him, pulled him off the gate, and began stabbing him in the back. They were stabbing him for "some seconds when [he] thought about . . . that little pocket knife in [his] pocket." When he reached the knife, he "knew that . . . it was time to use it." He turned to face his attackers, and saw all "four" of the male Hispanics confronting him. Harris could not see what they were using to stab and hit him.[5] Harris, who felt he had no option, with his pocketknife "began to stab as many of [the male Hispanic assailants] as he could; . . . [he] was fighting for his life." The altercation "went on for awhile" and then Harris "saw an opening and . . . ran out of there . . . to another house," approximately three houses down 48th Street. As he ran from the side of the first house, he encountered Concha who said, "Holmes [*sic*] why did you stab me?" Harris "hit [Concha] up under the chin, [or] on the neck . . . ."

Harris ran to a second house, beat on the door, and eventually an African-American man and his girlfriend came out. Harris asked them to call 911 because "physically [he] was in bad shape, and mentally as well . . . . [He] just wanted to get some help from the police . . . ." He was "bleeding profusely all over." The man who answered the door had a gun in his hand and told Harris "to step off the porch." Harris told the couple at the second house, "four Mexican guys are trying to kill me."

The man and woman who answered the door at the second house were Dalvin Cooper and Taneica Talbert. Cooper observed that there was blood all over his porch. Harris kept repeating the same things, "Please call the police. They're trying to kill me. Please, please, sir, call the police. They're trying to kill me." Harris "had a very scared look on his face." Cooper observed that Harris had "[a] lot of cuts on his hands [and] arms . . . [and] a big cut like almost behind his ear. He was bleeding from the head area . . . [and had c]uts almost everywhere." Cooper did not see anyone else on the street, but Talbert looked down the street and saw two men standing by the stop sign. She also observed that Harris "[l]ooked scared for his life." Cooper called the police.

Once Cooper and Talbert answered the door, Harris did not see what became of his four assailants. Eventually, the police arrived at the scene, and Harris told them what had happened. The paramedics arrived and began to treat Harris's wounds. They transported him to California Hospital Medical Center.

---

[5] Harris, who wore glasses, had them knocked off during the altercation on the side of the house.

Harris sustained an injury to his collarbone and suffered wounds to his left shoulder that required stitches, to his side and back, to his stomach, to his chest, to his upper right shoulder that required stitches, to his back that required stitches, to the right side of his neck, to his head behind his right ear, to his right temple that required stitches, to the left side of his head behind his left ear that required stitches, to his right arm, and to his finger. He received a total of about 60 stitches, and had residual injuries from blows to his head that caused him to be extremely light sensitive and that required him to return to the hospital for an overnight stay.

Harris identified Hernandez from a six-pack photographic lineup, but could not identify Concha from a photographic lineup. At the preliminary hearing and at trial, however, he identified both defendants as two of the men who confronted, threatened, and attacked him. Decoud also positively identified Hernandez as one of the three male Hispanics that chased Harris down Normandie and as the one he saw returning, holding his side.

On that same evening, Gabriel Estrada was employed as a security guard outside the emergency room of the California Hospital Medical Center. Paramedics came to Estrada and informed him that there was a man in the parking lot bleeding who needed help. Estrada contacted nurses and doctors, and they ran out to the parking lot with a gurney. Estrada observed a male Hispanic lying on the ground (presumably Max Sanchez) and three other males standing over him. One of the three men standing over Sanchez said, "He need[s] help. He's bleeding." Estrada asked what happened, and the man replied, "He's just bleeding. He was stabbed real bad and needs . . . help." The man with whom Estrada spoke was a Hispanic male with no shirt and tattoos on his chest. That man (presumably Concha) informed Estrada that he "was stabbed too . . . ," and asked Estrada whether he "should go in?" Estrada replied, "Come in. We can help you out," but the man just sat there and said again, "Should I go in?" Estrada said, "yeah, we can help you out," but the injured man refused to enter the hospital.

The other two male Hispanics told the man trying to help Sanchez to get in a van, and the man complied. The van was a white, older model vehicle. As the van left the emergency room parking lot, Estrada wrote down the license plate number and gave it to the police. About 45 minutes to an hour after the van left, Estrada again saw the injured man who had refused help. Concha returned to the emergency room in a rescue ambulance with a stab wound to his neck or chest. He and his two companions had shaved heads. Estrada reviewed a security videotape of the emergency room ambulance bay from that night and was able to identify himself depicted on the video running out

of the emergency room with a flashlight and speaking with three individuals, who then walked away from him.

Hernandez admitted in a taped interview with police that he took his cousin, Sanchez, to the hospital after Sanchez and Hernandez fought with "some Black fool," and that he learned the next day that Sanchez had died. Dr. Ajay Panchal, a deputy medical examiner for the Los Angeles County coroner's office, conducted an autopsy on Sanchez to determine the manner and cause of death. Sanchez had sustained a total of six stab wounds, including fatal wounds to the heart and lung. Dr. Panchal did not determine the time of death, but he was aware that Sanchez had been admitted to the hospital and subsequently pronounced dead. He was also aware of attempted lifesaving measures performed on Sanchez at the hospital.

The morning after the attack on Harris, Los Angeles Police Officer Alberto Rosa arrived at the fight scene—1340 West 48th Street, the house closest to Normandie. He observed blood on the west wall of the residence, and a broken window near the blood on the wall. He also saw blood on the sidewalk in front of the residence. In the side yard of the residence, Officer Rosa recovered several items of evidence in close proximity to one another, including a "can opener," a lighter, a broken "top" of a Pacifico beer bottle, and a "rubber tip" of a can opener that appeared to belong to the can opener he recovered. Rosa also recovered a broken Pacifico beer bottle from the ledge of a public pay phone on the corner of 48th Street and Normandie.[6]

At Concha's residence, Officer Rosa located bloody clothing on the floor. Outside Concha's residence in the rear alley, Officer Rosa located a white van with the same license plate number as the one provided to police by Estrada. Inside the van, Officer Rosa found bloody clothing and Sanchez's driver's license, which was inside a checkbook on the floor near the driver's seat. Officer Rosa observed blood on the right rear passenger or sliding cargo door, in the area of the driver's seat, on the outside of the driver's door, on the front passenger seat of the vehicle, on the steering wheel, on the rear middle passenger bench, and on the interior rear passenger door of the van.

Surrounding the van, Officer Rosa found two bottles of Pacifico beer to the rear of the van, a black and orange "beanie," a white T-shirt hung over a wooden fence, and a Pacifico beer bottle at the front of the van. About 22 feet from the van, Officer Rosa located another Pacifico beer bottle and a toy gun with an orange tip.

---

[6] When shown a photograph of the beer bottle he recovered from the pay phone, Officer Rosa described it as "intact."

In his tape-recorded interview with police, Hernandez admitted that on the day of the incident, he and his cousin, Sanchez, began drinking beer at Hernandez's house about 7:30 p.m. By around 10:30 p.m., they were drinking in the alley around 45th Street and Normandie. Hernandez had a beer in his hand, "some kind of black . . . Pacifico beer . . . ." "[S]ome black fool . . . and some other fools were walking." Then, "this black fool kind of get crazy." Hernandez "started running behind them." They "ran all the way to 48[th Street] and Normandie." Hernandez recalled running with a beer in his hand. At "48[th Street] and Normandie[,] [Hernandez] could see [Sanchez]." "They were fighting [Harris]. . . ." So "[Hernandez] got involved [be]cause [he saw] his cousin right there." "[Hernandez] threw a bottle at him [Harris] [be]cause [he] wanted . . . [to] get [Harris] off [Sanchez]." Hernandez also threw a can opener. "When he [Harris] turn[ed] around[,] he [struck] [Hernandez] . . . . [I]t was dark and [Hernandez] did not know that he [Harris] had a knife or whatever it was. And then he [Harris] [struck] Hernandez." "[Sanchez] ran to the corner . . . [¶] . . . of Normandie and 48[th Street]." "[Sanchez] was dying on [Hernandez] and [Hernandez] gave him mouth to mouth [but Sanchez] didn't want to wake up . . . [Hernandez tried] waking him up."

According to Concha's taped interview with police, he "got into a little argument with some black guy . . . probably like [around] . . . [¶] Normandie and Vermont [presumably Vernon]." "[He] was close to his house." Concha identified a photograph of his cousin "Max" (presumably Sanchez). When asked if "you guys got into an argument . . . [w]ith some black guy driving a car?," Concha replied, "I don't know if he was driving or not. I just remember the one that was fighting and then . . . I got out [of the car] to help him fight." Concha admitted that the white minivan located by police behind Concha's house belonged to him. Concha dropped Sanchez off at the hospital and he "went home." And he remembered that when he "got home [he] start[ed] passing out or something . . . . [¶] . . . [He had lost] a lot of blood."

On the evening of the incident, Hernandez's younger brother, Anthony, observed his cousin, Sanchez, arrive at their house around 6:00 or 7:00 p.m. Sanchez and Hernandez were "very close." Sanchez brought beer with him, and he and Hernandez were drinking in the living room. Concha arrived, but when Hernandez's mother discovered Concha's arrival, she "kicked [the three men] out" about 8:00 or 9:00 p.m.

## PROCEDURAL BACKGROUND

In connection with the attempted murder counts, the trial court instructed the jury as follows: "If you find the defendant guilty of attempted murder,

you must then decide whether the People have proved the additional allegation that the attempted murder was done willfully, and with deliberation and premeditation. [¶] (The defendant and/or a principal) acted willfully if (he) intended to kill when (he) acted. (The defendant and/or a principal) deliberated if (he) carefully weighed the considerations for and against (his) choice and, knowing the consequences, decided to kill. (The defendant and/or a principal) premeditated if (he) decided to kill before acting. [¶] The attempted murder was done willfully and with deliberation and premeditation *if either the defendant or a principal . . . or both of them* acted with that state of mind. . . ." (Italics added.) The trial court also gave an aiding and abetting instruction, and in that connection instructed that "[a] person is equally guilty of a crime whether he or she committed it personally or aided and abetted the perpetrator who committed it. [¶] . . . [¶] To prove that a defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that: 1. The perpetrator committed the crime; 2. The defendant knew the perpetrator intended to commit the crime; 3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime; AND 4. The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime."

On the first degree murder counts, the trial court instructed the jury on the provocative act doctrine[7] and then gave the following instructions: "If you decide that the defendant is guilty of murder, you must decide whether the murder is first or second degree. [¶] To prove that the defendant is guilty of first degree murder, the People must prove that: [¶] 1. Max Sanchez was killed during an attempt to commit murder OR [¶] 2. The defendant or an accomplice intended to commit robbery when he did the provocative act. [¶] In deciding whether the defendant or accomplice intended to commit robbery or murder and whether the death occurred during the attempt to commit robbery or murder, you should refer to the instructions I have given you on those crimes. [¶] Any murder that does not meet these requirements for first degree murder, is second degree murder."

On the murder counts the jury returned the following verdict as to Hernandez, "We, the jury in the above-entitled action, find the defendant JULIO HERNANDEZ, GUILTY of the crime of MURDER IN THE FIRST DEGREE as to Max Sanchez, in violation of Penal Code section 187(a), a crime as charged in Count One of the Information. [¶] We further find the

---

[7] "The words 'provocative act murder' are merely shorthand used 'for that category of intervening-act causation cases in which, during commission of a crime, the intermediary (i.e., a police officer or crime victim) is provoked by the defendant's conduct into [a response that results] in someone's death.' [Citation.]" (*People v. Concha, supra,* 47 Cal.4th at p. 663.)

allegation that in the commission and attempted commission of the above offense, said defendant personally used a deadly and dangerous weapon, to wit: Beer Bottles, said use not being an element of the above offense, within the meaning of Penal Code Section 12022(b)(1) to be: TRUE. [¶] We base our verdict of guilty on a unanimous conclusion that the defendant personally committed a provocative act. Answer YES."

On the attempted murder counts, the jury returned the following verdict as to Hernandez, "We, the jury in the above-entitled action, find the defendant, JULIO HERNANDEZ, GUILTY of the crime of ATTEMPTED MURDER, in violation of Penal Code Section 664/187(a) as to Jimmy Lee Harris, a human being, as charged in Count Two of the Information. [¶] We further find the allegation that the aforesaid attempted murder was committed willfully, deliberately and with premeditation within the meaning of Penal Code Section 664(a) to be: TRUE. [¶] We further find the allegation that in the commission and attempted commission of the above offense, said defendant personally used a deadly and dangerous weapon, to wit: Beer Bottles, said use not being an element of the above offense, within the meaning of Penal Code Section 12022(b)(1) to be: TRUE." The jury returned similar verdicts as to Concha, except as to the personal use of a deadly and dangerous weapon allegation, upon which the jury could not reach a unanimous verdict.

Defendants appealed their judgments of conviction to this court, and we directed the trial court to make certain modifications to the sentences, but otherwise affirmed the judgments. The Supreme Court granted defendants' petitions for review on the issue of whether the trial court erred in allowing the jury to return verdicts of first degree murder when the case was tried on a theory of provocative act murder.[8] The Supreme Court agreed with this court in holding that there could be a conviction for first degree murder under the provocative act theory. The Supreme Court then addressed the jury instructions and stated, "a defendant charged with murder or attempted murder can be held vicariously liable for the actus reus of an accomplice, but, for murder, a defendant cannot be held vicariously liable for the mens rea of an accomplice. [Citation.] The same is not true for an attempted murder . . . , although each defendant must have the intent to kill, a defendant may be

---

[8] In a provocative act murder, neither a defendant nor a defendant's accomplices kill or intend to kill the victim—in this case, Sanchez. Rather, a third person—in this case, Harris—kills, and the victim is an accomplice or an innocent bystander—here, the accomplice Sanchez. "The actus reus element of the crime consists of an act provoking the third party, and the mens rea element consists of knowledge, by defendant or defendant's accomplice, that the provocative act has a ' "high probability" not merely a "forseeable possibility" of eliciting a life-threatening response from the third party.' [Citation.]" (1 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Crimes Against the Person, § 192, p. 802.)

vicariously liable for the premeditated and deliberate component of the mens rea of an accomplice. [Citation.]" (*People v. Concha, supra,* 47 Cal.4th at p. 665.) The court concluded that although the trial court properly instructed the jury with regard to first degree attempted murder, "it appears that the trial court did err when instructing on first degree murder, as opposed to attempted murder, by not providing an instruction that explained that for a defendant to be found guilty of *first degree murder,* he *personally* had to have acted willfully, deliberately, and with premeditation when he committed the attempted murder. [Citation.]" (*Id.* at p. 666.) The court added, "We therefore remand the matter for the Court of Appeal to consider whether this error was prejudicial." (*Ibid.*)

## DISCUSSION

### A.   *Legal Principles*

#### 1.   *Willful, Deliberate and Premeditated*

██   First degree murder includes any "kind of willful, deliberate, and premeditated killing." (Pen. Code, § 189.) Under the provocative act doctrine, the necessary mens rea for the first degree murder convictions is determined from defendants' mental state during the attempted murder of Harris. We therefore analyze the facts relevant to whether defendants personally acted with willfulness, premeditation, and deliberation in committing that crime.

██   Attempted murder, as the jury found in this case as to each defendant, " 'requires the specific intent to kill . . . .' " Attempted murder requires "express malice, i.e., intent to kill." (*People v. Stone* (2009) 46 Cal.4th 131, 136, 139 [92 Cal.Rptr.3d 362, 205 P.3d 272]; see also *People v. Smith* (2005) 37 Cal.4th 733, 742 [37 Cal.Rptr.3d 163, 124 P.3d 730].) The word "willful" means intentional. "[W]illfulness does not include any concept that is not contained in express malice." (*People v. Moon* (2005) 37 Cal.4th 1, 29 [32 Cal.Rptr.3d 894, 117 P.3d 591].) Accordingly, we focus on "deliberate and premeditated" because the finding of attempted murder includes a finding of willfulness.

██   " 'A verdict of deliberate and premeditated first degree murder requires more than a showing of intent to kill. [Citation.] "Deliberation" refers to careful weighing of considerations in forming a course of action;

"premeditation" means thought over in advance. [Citations.] "The process of premeditation and deliberation does not require any extended period of time. 'The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly. . . .' [Citations.]" ' (*People v. Koontz* (2002) 27 Cal.4th 1041, 1080 [119 Cal.Rptr.2d 859, 46 P.3d 335].)" (*People v. Harris* (2008) 43 Cal.4th 1269, 1286–1287 [78 Cal.Rptr.3d 295, 185 P.3d 727]; see *People v. Thomas* (1945) 25 Cal.2d 880, 900 [156 P.2d 7] ["By conjoining the words 'willful, deliberate, and premeditated' in its definition and limitation of the character of killings falling within murder of the first degree the Legislature apparently emphasized its intention to require as an element of such crime substantially more reflection than may be involved in the mere formation of a specific intent to kill."].)

In *People v. Anderson* (1968) 70 Cal.2d 15, 26–27 [73 Cal.Rptr. 550, 447 P.2d 942], the Supreme Court described the categories of evidence relevant to premeditation and deliberation that have been found sufficient to sustain convictions of first degree murder: "(1) facts about how and what defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing—what may be characterized as 'planning' activity; (2) facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that the killing was the result of 'a pre-existing reflection' and 'careful thought and weighing of considerations' rather than 'mere unconsidered or rash impulse hastily executed' (*People v. Thomas, supra*, 25 Cal.2d 880, at pp. 898, 900–901); (3) facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take his victim's life in a particular way for a 'reason' which the jury can reasonably infer from facts of type (1) or (2)." (See also *People v. Mayfield* (1997) 14 Cal.4th 668, 768 [60 Cal.Rptr.2d 1, 928 P.2d 485].)

In *People v. Lenart* (2004) 32 Cal.4th 1107, 1127 [12 Cal.Rptr.3d 592, 88 P.3d 498], however, the court stated, "The *Anderson* factors are not the exclusive means for establishing premeditation and deliberation. (*People v. Perez* (1992) 2 Cal.4th 1117, 1125 [9 Cal.Rptr.2d 577, 831 P.2d 1159].) This court has, for example, concluded that an execution-style killing may be committed with such calculation that the manner of killing will support a jury finding of premeditation and deliberation, despite little or no evidence of planning and motive. (*People v. Hawkins* (1995) 10 Cal.4th 920, 957

[42 Cal.Rptr.2d 636, 897 P.2d 574].) [¶] We have never required that there be an extensive time to premeditate and deliberate. (*People v. Mayfield, supra*, 14 Cal.4th at p. 767; *People v. Perez, supra*, 2 Cal.4th at p. 1127.)" (See also *People v. Thomas* (1992) 2 Cal.4th 489, 517 [7 Cal.Rptr.2d 199, 828 P.2d 101] ["Unreflective reliance on *Anderson* for a definition of premeditation is inappropriate. The *Anderson* analysis was intended as a framework to assist reviewing courts in assessing whether the evidence supports an inference that the killing resulted from preexisting reflection and weighing of considerations. It did not refashion the elements of first degree murder or alter the substantive law of murder in any way. [Citation.] *Anderson* identifies categories of evidence relevant to premeditation and deliberation that we 'typically' find sufficient to sustain convictions for first degree murder."].)

## 2. *Applicable Harmless Error Standard*

"[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824].) It has been held with respect to instructional error, " 'the omission of an element [of a substantive offense] is an error that is subject to harmless-error analysis' under *Chapman* (*Neder v. United States* (1999) 527 U.S. 1, 15 [144 L.Ed.2d 35, 119 S.Ct. 1827]) . . . ." (*People v. Prieto* (2003) 30 Cal.4th 226, 256 [133 Cal.Rptr.2d 18, 66 P.3d 1123].) The court in *Neder v. United States, supra*, 527 U.S. at pages 9–10 (*Neder*), stated, "We have often applied harmless-error analysis to cases involving improper instructions on a single element of the offense. See, *e.g., Yates* v. *Evatt*, 500 U.S. 391 [114 L.Ed.2d 432, 111 S.Ct. 1884] (1991) (mandatory rebuttable presumption); *Carella* v. *California*, 491 U.S. 263 [105 L.Ed.2d 218, 109 S.Ct. 2419] (1989) *(per curiam)* (mandatory conclusive presumption); *Pope* v. *Illinois*, 481 U.S. 497 [95 L.Ed.2d 439, 107 S.Ct. 1918] (1987) (misstatement of element); *Rose* [*v. Clark* (1986) 478 U.S. 570 [92 L.Ed.2d 460, 106 S.Ct. 3101]] (mandatory rebuttable presumption). In other cases, we have recognized that improperly omitting an element from the jury can 'easily be analogized to improperly instructing the jury on an element of the offense, an error which is subject to harmless-error analysis.' *Johnson*[ *v. United States* (1997) 520 U.S. 461,] 469 [137 L.Ed.2d 718, 117 S.Ct. 1544] (citations omitted); see also *California* v. *Roy*, (1996) 519 U.S. 2, 5 [136 L.Ed.2d 266, 117 S.Ct. 337] *(per curiam)* ('The specific error at issue here—an error in the instruction that defined the crime—is . . . as easily characterized as a "misdescription of an element" of the crime, as it is characterized as an error of "omission" '). In both cases—misdescriptions and omissions—the erroneous instruction precludes the jury from making a

finding on the *actual* element of the offense." Error in connection with the failure to give instructions on premeditation and deliberation or in connection with the application of the premeditation and deliberation requirement can be subject to harmless error analysis. (See, e.g., *People v. Prieto, supra,* 30 Cal.4th at pp. 253–254.)

■    According to the court in *Neder, supra,* 527 U.S. 1, instructional errors that arguably "preclude" the jury from finding an element of an offense (*id.* at pp. 17–18) are analogous to the erroneous admission or exclusion of evidence at trial for purposes of determining whether the constitutional error is harmless. "The erroneous admission of evidence in violation of the Fifth Amendment's guarantee against self-incrimination, see *Arizona* v. *Fulminante,* 499 U.S. 279 [113 L.Ed.2d 302, 111 S.Ct. 1246] (1991), and the erroneous exclusion of evidence in violation of the right to confront witnesses guaranteed by the Sixth Amendment, see *Delaware* v. *Van Arsdall* [(1986) 475 U.S. 673] [89 L.Ed.2d 674, 106 S.Ct. 1431], are both subject to harmless-error analysis under our cases." (*Neder, supra,* 527 U.S. at p. 18.)

After discussing the application of the harmless error rule to various errors of constitutional dimension, the court in *Neder, supra,* 527 U.S. at page 18, stated: "We think, therefore, that the harmless-error inquiry must be essentially the same: *Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?*[9] To set a barrier so high that it could never be surmounted would justify the very criticism that spawned the harmless-error doctrine in the first place: 'Reversal for error, regardless of its effect on the judgment, encourages litigants to abuse the judicial process and bestirs the public to ridicule it.' R. Traynor, The Riddle of Harmless Error 50 (1970)." (Italics added.)

The court in *Neder, supra,* 527 U.S. at pages 18–19, explained the rationale underlying the foregoing formulation of the harmless error standard as

---

[9] Justice Scalia dissenting (joined by Justices Ginsburg and Souter) stated, "*the Constitution does not trust judges to make determinations of criminal guilt.* . . . And so the people reserved the function of determining criminal guilt *to themselves,* sitting as jurors. It is not within the power of us Justices to cancel that reservation—neither by permitting trial judges to determine the guilt of a defendant who has not waived the jury right, nor (when a trial judge has done so anyway) by reviewing the facts ourselves and pronouncing the defendant without-a-doubt guilty. . . . [¶] . . . [¶] The difference between speculation directed toward *confirming* the jury's verdict *(Sullivan)* [*Sullivan* v. *Louisiana* (1993) 508 U.S. 275 [124 L.Ed.2d 182, 113 S.Ct. 2078]] and speculation directed toward *making a judgment that the jury has never made* (today's decision) is more than semantic. . . . [¶] Whereas *Sullivan* confined appellate courts to their proper role of reviewing *verdicts,* the Court today puts appellate courts in the business of reviewing the defendant's *guilt.*" (*Neder, supra,* 527 U.S. at pp. 32–39; see also *Hedgpeth v. Pulido* (2008) 555 U.S. ___, ___ [172 L.Ed.2d 388, 129 S.Ct. 530, 535] (dis. opn. of Stevens, J.).)

follows: "We believe that where an omitted element is supported by uncontroverted evidence, this approach reaches an appropriate balance between 'society's interest in punishing the guilty [and] the method by which decisions of guilt are to be made.' *Connecticut v. Johnson* [(1983)] 460 U.S. [73,] 86 [74 L.Ed.2d 823, 103 S.Ct. 969] (plurality opinion). The harmless-error doctrine, we have said, 'recognizes the principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence, . . . and promotes public respect for the criminal process by focusing on the underlying fairness of the trial.' *Van Arsdall, supra,* at 681. At the same time, we have recognized that trial by jury in serious criminal cases 'was designed to "guard against a spirit of oppression and tyranny on the part of rulers," and "was from very early times insisted on by our ancestors in the parent country, as the great bulwark of their civil and political liberties." ' [*United States v.*] *Gaudin* [(1995) 515 U.S. 506,] 510–511 [132 L.Ed.2d 444, 115 S.Ct. 2310] (quoting 2 J. Story, Commentaries on the Constitution of the United States 540–541 (4th ed. 1873)). In a case such as this one, where a defendant did not, and apparently could not, bring forth facts contesting the omitted element, answering the question whether the jury verdict would have been the same absent the error does not fundamentally undermine the purposes of the jury trial guarantee. [¶] Of course, *safeguarding the jury guarantee will often require that a reviewing court conduct a thorough examination of the record.* If, at the end of that examination, the court cannot conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error—for example, where the defendant contested the omitted element and raised evidence sufficient to support a contrary finding— it should not find the error harmless." (*Id.* at pp. 18–19, italics added.)

The court in *Neder, supra,* 527 U.S. at page 15, did say that the proper harmless error test "is whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' " But, as Justice Baxter observed, "this test does not depend on proof that the jury *actually* rested its verdict on the proper ground (*Neder, supra,* at pp. 17–18), but rather on proof beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error (*id.* at p. 18). Although the former *can be* proof of the latter (see *id.* at p. 26 (conc. opn. of Stevens, J.)), the *Neder* majority made clear that such a determination is not essential to a finding of harmlessness (*id.* at p. 16, fn. 1), which instead 'will often require that a reviewing court conduct a thorough examination of the record' (*id.* at p. 19)." (*People v. Cross* (2008) 45 Cal.4th 58, 71 [82 Cal.Rptr.3d 373, 190 P.3d 706] (conc. opn. of Baxter, J.).)

Defendants contend that the application of the harmless error standard by the court in *People v. Chun* (2009) 45 Cal.4th 1172 [91 Cal.Rptr.3d 106,

203 P.3d 425] (*Chun*) does not support a determination of harmless error in this case. We disagree. In *Chun*, the Supreme Court explained the general standard by which we determine whether an instructional error as to the elements of an offense was prejudicial to a defendant. "Instructional error regarding the elements of the offense requires reversal of the judgment unless the reviewing court concludes beyond a reasonable doubt that the error did not contribute to the verdict. (*People v. Cross*[, *supra*,] 45 Cal.4th 58, 69–71 . . . (conc. opn. of Baxter, J.); *People v. Swain* (1996) 12 Cal.4th 593, 607 [49 Cal.Rptr.2d 390, 909 P.2d 994]; *People v. Calderon* (2005) 129 Cal.App.4th 1301, 1306–1307 [29 Cal.Rptr.3d 277] [erroneous instruction on the second degree felony-murder rule]; see *Hedgpeth v. Pulido*[, *supra*,] 555 U.S. ___ . . . [reiterating that error of this nature is subject to harmless error analysis]; *Neder v. United States*[, *supra*,] 527 U.S. [at p.] 15 . . . [stating the reasonable doubt test].)" (*Chun, supra*, 45 Cal.4th at p. 1201; see also *People v. Farley* (2009) 46 Cal.4th 1053, 1116, fn. 22 [96 Cal.Rptr.3d 191, 210 P.3d 361].) But, in *Chun*, the court was able to determine from other aspects of the verdict and the evidence that the jury *actually* made the omitted finding, concluding that "[i]f other aspects of the verdict or the evidence leave no reasonable doubt that the jury made the [necessary] findings . . . , the erroneous . . . instruction was harmless." (*Chun*, at p. 1205.) Earlier in the opinion, however, the court in *Chun* acknowledged that " ' "[t]here may be additional ways by which a court can determine that error in [this] situation is harmless." ' " (*Id.* at p. 1203, quoting Justice Baxter's concurring opinion in *People v. Cross, supra*, 45 Cal.4th at p. 70.) Thus, because *Chun* did not involve an erroneous instruction that obviated the need for the jury to make a finding as to an element of an offense, but rather involved a record from which the court was able to determine that the jury *actually* made the omitted finding, the harmless error standard applied in that case has no application here. Given the court's recognition that there were additional ways to determine harmless error, the opinion in *Chun* is therefore consistent with Justice Baxter's analysis in *People v. Cross, supra*, 45 Cal.4th at pages 69–71.[10]

## B. *Prejudicial Error Analysis*

According to defendants, because the parties and the jury were unaware of the personal willful, deliberate, and premeditation requirement as to the murder counts, the jury could not have made, and did not make, the requisite findings for first degree murder for each defendant. In addition, defendants,

---

[10] It has been intended, "By its very terms, of course, Chapman precludes a court from finding harmlessness based simply 'upon [its own] view of "overwhelming evidence." ' (*Chapman v. California, supra*, 386 U.S. at p. 23 [17 L.Ed.2d at p. 710].)" (*People v. Johnson* (1993) 6 Cal.4th 1, 57 [23 Cal.Rptr.2d 593, 859 P.2d 673] (dis. opn. of Mosk, J.); see *id.* at p. 56 ["[T]he reviewing court is not the proper decisionmaker."].) It is not for us to consider whether the law of harmless error has strayed from these principles.

citing to *Chun, supra*, 45 Cal.4th 1172, argue that it cannot be determined from other aspects of the verdicts or the evidence that the jury *actually* made the necessary finding of premeditation and deliberation.

Defendants, however, misperceive the harmless error standard applicable to a case such as this one, in which the instructional error did not require the jury to make a finding on an essential element of the offense—a willful, deliberate and premeditated killing. As discussed above, based on the authorities, we do not have to determine if the verdicts reflect that the jury actually determined that both defendants deliberated and premeditated the attempted murder. Rather, we may review the entire record to determine whether it is clear beyond a reasonable doubt that a rational jury would have made the necessary findings of premeditation and deliberation absent the error.

The evidence was such that beyond a reasonable doubt a rational jury would have found that each defendant deliberated and premeditated the attempted murder of Harris. Hernandez and Concha confronted Harris in the alley, while Sanchez and an unidentified fourth assailant stood nearby. Concha demanded money and twice threatened to kill Harris. Although the jury did not reach a unanimous verdict on the attempted robbery counts, that does not mean, as defendants contend, that the jury disbelieved Harris when he testified that Concha twice threatened to kill him. Harris's testimony in that regard was supported by his subsequent testimony that he told bystanders during the chase that his pursuers were trying to kill him.

Harris resisted all four of the assailants, who then fought with him in the alley. When Harris broke free and ran, the four assailants pursued him for a quarter of a mile. An eyewitness saw Hernandez, who admitted carrying a beer bottle during the chase, leading the group, and saw at least one other member of the group carrying a beer bottle. All four assailants cornered Harris on the side of a house and began to beat and stab him. During the melee, Concha was stabbed by Harris, which fact confirmed that Concha was actively involved in the assault on Harris, regardless of whether Concha was armed with a deadly weapon. The assault was sufficiently aggravated that Harris received multiple stab wounds to his head and body, requiring over 60 stitches to close. (See *People v. Prieto, supra*, 30 Cal.4th at p. 253 ["In this case, the evidence overwhelmingly established that defendant 'weigh[ed] and consider[ed] the question of killing' . . ."].)

Moreover, by returning guilty verdicts on the attempted murder counts, the jury found that each defendant either intended to kill Harris or shared in the

other's intent to kill Harris. The jury also found that each defendant personally committed a provocative act during the attempted murder of Harris and that Hernandez personally used a deadly weapon—a beer bottle—during the attempted murder. And, the jury found that the attempted murder was committed with premeditation and deliberation, meaning at a minimum that the jury believed that at least one of Harris's assailants had the requisite mens rea for first degree murder.

The court in *Neder, supra,* 527 U.S. at pages 18–19, did state, as quoted above, "We believe that where an omitted element is supported by *uncontroverted* evidence, this approach reaches an appropriate balance between 'society's interest in punishing the guilty [and] the method by which decisions of guilt are to be made.' [Citation.] . . . *In a case such as this one, where a defendant did not, and apparently could not, bring forth facts contesting the omitted element,* answering the question *whether the jury verdict would have been the same absent the error* does not fundamentally undermine the purposes of the jury trial guarantee." (Italics added.) Defendants argue that evidence was controverted and that they did submit evidence as to the lack of premeditation and deliberation. But the evidence they introduced dealt with their participation in the murder and their intent to kill, and the jury found against them on those points. They did not contest the facts that go specifically to premeditation and deliberation—the confrontation in the alley, the chase, the cornering of Harris and the repeated stab wounds with a deadly weapon. Premeditation and deliberation were submitted to the jury on the attempted murder counts; thus, defendants had the opportunity to address those elements. The facts supporting premeditation and deliberation were uncontradicted once the intent element was established. Although the jury verdict is deficient in that there was not a finding of premeditation and deliberation as to each defendant, the jury did nevertheless render a verdict of first degree murder against both defendants. Based on the evidence, the jury verdict would have been the same absent the error.

■ That defendants participated in a confrontation with Harris during which threats to kill him were uttered, chased Harris for a quarter mile with deadly weapons, and participated in one fashion or another in the repeated and brutal stabbing and beating of Harris after cornering him, proves the reflection in advance and weighing of considerations sufficient to establish that it is clear beyond a reasonable doubt that a rational jury would have found that both defendants premeditated and deliberated. In sum, once the jury found the necessary intent to commit murder, in view of the circumstances, premeditation and deliberation are readily apparent. Given the facts and findings, the instructional error was harmless under the standard articulated in *Neder, supra,* 527 U.S. 1.

## DISPOSITION

The first degree murder conviction of each defendant is affirmed. As we previously held, the abstracts of judgment shall be modified to reflect that Hernandez was sentenced to seven years to life on count 2, doubled to 14 years based on the prior strike conviction, and that Concha was sentenced to a life term with the possibility of parole on count 2. As we also previously held, the abstracts shall also be corrected to reflect that Hernandez received 496 days of custody credit and that Concha received 489 days of custody credit. In all other respects, the judgments of conviction are affirmed.

Armstrong, Acting P. J., and Weisman, J.,* concurred.

A petition for a rehearing was denied March 31, 2010, and the opinion was modified to read as printed above. Appellants' petition for review by the Supreme Court was denied June 9, 2010, S181954.

---

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.