Filed 4/4/22  P. v. Lee CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C088531 |
| Plaintiff and Respondent, | (Super. Ct. No. 17FE002754) |
| v. | |
| ARMANI SICILIAN LEE, | |
| Defendant and Appellant. | |

After the trial court found a testifying eyewitness to a shooting in contempt of court for refusing to answer the vast majority of the prosecutor's questions on direct examination, it determined the witness nevertheless had provided "evasive and untruthful" "implied testimony" inconsistent with earlier statements to police. Accordingly, pursuant to Evidence Code section 1235, the trial court permitted the prosecution to play to the jury the witness's recorded prior inconsistent statement identifying defendant, Armani Sicilian Lee, as the shooter.  On appeal, defendant argues (1) under the doctrine of collateral estoppel, the contempt order barred the trial court's

later evidentiary ruling; (2) the erroneous evidentiary ruling violated defendant's Sixth Amendment right to confront a witness; and (3) trial counsel provided ineffective assistance by failing to move to strike all of an eyewitness's testimony.

We conclude any error by the trial court in connection with defendant's statutory claim was harmless (which conclusion also resolves defendant's claim of ineffective assistance), and defendant's Sixth Amendment claim fails because there is no record on which to decide it, given defense counsel's choice to forego cross-examination of the witness.

## BACKGROUND

*Factual background*

On February 4, 2017, L.J. was sitting on the outdoor stairway of her apartment building in Sacramento, talking on the phone and laughing, when she saw defendant on the second-floor walkway on the other side of the building. L.J. had known defendant for several months at that point, but the two were not getting along. Defendant approached L.J. and accused her of laughing at him.

Defendant spat at L.J. after she denied laughing at him, and the two fought briefly before defendant pushed L.J. down. L.J. pursued defendant through the apartment complex. During the pursuit, she saw defendant stop with his back to her, and then heard four or five gunshots. L.J. testified she did not actually *see* defendant fire a gun.

Before the incident, there were no bullet holes in L.J.'s apartment's front door. Photographs of the front door admitted into evidence at trial showed three bullet holes in it. According to an officer who responded to the shooting, the bullet holes appeared "fresh."

Police collected bullet shell casings, and interviewed L.J.—who identified defendant in a photograph as the person with whom she had the altercation that day.

Police also interviewed L.J.'s boyfriend, Paea Lui, who sometimes stayed at L.J.'s apartment, and was inside the apartment when police responded. In a recorded interview,

2

Lui told officers that he was by the front door of L.J.'s second-floor apartment when he saw a man he knew as "Armani" shooting at the apartment from "downstairs." Lui heard about three gunshots as he slammed the door shut.

Six days later, on February 10, 2017, police were prepared to arrest defendant for shooting at L.J.'s apartment. But before they could, defendant fired multiple gunshots at them. Police returned fire, and defendant fell to the ground.

Police collected multiple shell casings and a handgun found on the ground a few feet from defendant.

A ballistics expert testified that the gun found a few feet from defendant on February 10, 2017, was the same gun that left bullet shell casings near L.J.'s apartment on February 4, 2017.

*Procedural background*

An October 2018 second amended information charged defendant with seven offenses, and various enhancements. Concerning the shooting on February 4, 2017, defendant was charged with discharging a firearm at an inhabited dwelling (Pen. Code, § 246; count one)[1] and being a felon in unlawful possession of a firearm (§ 29800, subd. (a)(1); count two). Concerning the shooting on February 10, 2017, defendant was charged with, inter alia, premeditated attempted murder of two police officers (§§ 664, subd. (e)/187, subd. (a); counts three & five).

When the prosecution called Lui as a witness he admitted that he was convicted of a felony in 2012, and that he would "rather not be" in court testifying. When the prosecutor asked if Lui was dating L.J. in February 2017, Lui replied, "I plead the fifth." When the prosecutor asked Lui if he witnessed a shooting at L.J.'s apartment complex in February 2017, Lui replied "I plead the fifth." Lui gave similar responses to numerous

---

[1]     Further undesignated statutory references are to the Penal Code.

other questions by the prosecutor, including whether Lui "identif[ied] the person who committed [the] shooting."

The trial court suspended questioning and appointed an attorney for Lui, who later told the trial court that though she saw no grounds for invocation of Lui's Fifth Amendment right against self-incrimination, and advised Lui of the possibility of contempt proceedings, Lui indicated to her that he nevertheless "did not wish to testify."

The trial court ordered Lui to "answer questions asked by attorneys from both sides in this case and to do so truthfully and completely. If you refuse to answer questions in this case, you are subject to being held in contempt of court." Lui told the trial court he understood.

When the prosecutor resumed questioning, Lui provided his age, birthplace, and city of residence in 2017, and *denied* that he lived at L.J.'s apartment complex in February 2017, or dated L.J. Lui said he "refuse[d] to answer" whether he was the victim of a shooting in February 2017. Lui refused to answer many other questions the prosecutor posed about the February 2017 shooting at L.J.'s apartment complex, at one point responding: "Fuck you and fuck you and fuck you. How do you like that answer?"

When the prosecutor asked Lui if he recalled meeting the prosecutor "a couple weeks ago," Lui answered "[n]o." When the prosecutor asked if the two met or talked, Lui said, "I don't recall." The prosecutor asked Lui if he recalled what happened in February 2017, and Lui replied, "I don't even recall what I had for breakfast."

The prosecutor asked if Lui had "ever seen" defendant. Lui replied, "[f]uck you."

The prosecutor: "Did he shoot at you on February 4th of 2017?"

Lui: "Fuck you."

The prosecutor: "Did you identify him as the person that shot at you?"

Lui: "Fuck you."

Later, Lui replied "I'm not answering" four consecutive times when the prosecutor sought to elicit testimony that defendant pointed a gun and fired shots at Lui.

4

When the prosecutor ceased questioning Lui, the trial court asked defense counsel if she wanted to conduct cross-examination.  "Not based on this," counsel answered.

Later that day, the trial court found Lui in contempt of court, explaining in a written order that Lui "responded to a limited number of questions throughout the People's examination, but refused to answer the majority of questions.  The Court repeated[ly] instructed [Lui] to answer questions throughout the examination.  [Lui] repeated[ly] responded by saying, 'I refuse.'  . . . [Lui] indicated that he refused to answer questions relating to the February 4, 2017 alleged incident at issue in this case."  Thus, Lui was "guilty of contempt of court in violation of the Code of Civil Procedure section 1209(a) in that he . . . willfully disobeyed a lawful order of the court."

The trial court later granted the prosecution's motion to admit Lui's prior inconsistent (recorded) statement to police regarding the shooting on February 4, 2017, explaining the situation before it was *not* a "witness examination that included only a constant refusal to answer all questions," as Lui "expressly denied ever living at the apartment complex . . . in 2017" and " denied ever dating" L.J.

The trial court determined that Lui's answer " 'I don't even recall what I had for breakfast' . . . constitute[d] implied testimony that he d[id] not recall what happened in February 2017.  This [was] not a refusal to answer a question," but a "denial of recollection."  Given Lui's other responses to questioning, the trial court found Lui was being "evasive and untruthful."  Thus, the trial court reasoned, Lui's "prior recorded statement is inconsistent with his implied denial that he d[id] not recollect what occurred in February 2017."  Therefore, the prosecution was allowed to introduce into evidence "the portion of the prior recorded statement when . . . Lui describes what happened at the apartment complex in February 2017."

Lui's recorded prior statement was played to the jury.

Also played to the jury was surveillance footage "that showed a physical altercation between" defendant and L.J. in the apartment complex.

5

In closing argument to the jury, the prosecutor conceded L.J. did not "see the actual shooting," but explained "the important thing about her is she identifies who that person in the surveillance is."

Regarding Lui, the prosecutor said: "We heard from . . . Lui eventually. Obviously that was a bit of a tortured process. [¶] And let me just say this. There might have been some part of the process where I [was] trying to get [Lui] to answer questions or things like that. [¶] That might have kind of rubbed you the wrong way . . . . Please don't hold that against the case."

"[Y]ou were able to see exactly what he said to police. Obviously he was in the apartment that day, and essentially a guy he knows as Armani shot at him from the bottom floor.

"Do we absolutely need that piece. No. We have sufficient evidence from [L.J.], and the surveillance, but it's important to see all of the available evidence." The prosecutor argued the surveillance video showed "exactly how . . . defendant shot that gun. You can watch him do it."

The prosecutor also emphasized that "the gun that [defendant] was in possession of on February 10th, 2017, the one that he used to shoot at the police officers, is the same gun that was used in the shooting" on February 4, 2017.

The jury found defendant guilty of six of the seven charged offenses, including the two February 4, 2017 offenses, and the two February 10, 2017 counts of attempted murder. Regarding the attempted murders, the jury found defendant did not act with premeditation and deliberation, but—as to one count—knew or should have known the victim was a peace officer.

In December 2018, the trial court sentenced defendant to a determinate term of 55 years, and an indeterminate term of 118 years to life in state prison.

Defendant timely appealed.

6

Defendant argues we must reverse his convictions for the two February 4, 2017 offenses.

As a threshold matter, defendant argues that, under the doctrine of collateral estoppel (or "issue preclusion"), the trial court's "contempt judgment finding Lui failed to testify to matters relating to the charged events barred" the "later ruling Lui had, in fact, testified and was available for" cross-examination. Defendant further contends trial counsel provided ineffective assistance by failing to make this argument in the trial court.

On the merits, defendant argues the trial court erred in admitting Lui's prior inconsistent statement under Evidence Code section 1235, thereby violating his Sixth Amendment right to confront a witness against him.

Regarding the statutory claim, defendant contends "the record does not support the court's . . . conclu[sion] Lui did not refuse to testify." Regarding the constitutional claim, defendant suggests his right to confrontation was denied when Lui's "testimonial out of court statement[ ] [was] presented at trial without the opportunity to confront and cross examine [Lui]," because—though physically "present in court" and "able to answer some" of the prosecutor's questions—Lui was an "unavailable" "recalcitrant" witness who "refuse[d] to answer questions."

Defendant also argues trial counsel provided ineffective assistance by failing to "move to strike the entirety of Lui's testimony."

The People argue collateral estoppel is inapplicable, because the issue the trial court decided in its contempt ruling (whether, under Code Civil Proc., § 1209, subd. (a)(5), Lui demonstrated " '[d]isobedience of any lawful . . . order . . . of the court' ") was *not identical* to the issue decided in connection with the admissibility of Lui's prior statement vis-à-vis Evidence Code section 1235 ("whether Lui's testimony was inconsistent with the statements he gave" to police before trial).

7

On the merits of the statutory question, the People argue the trial court did not err, as "ample evidence supports the trial court's determination that Lui's selective silence during the direct examination amounted to deliberate evasion." On the constitutional question, the People argue Lui "was available for cross-examination" (despite "defense counsel'[s] cho[ice] not to ask any questions") thereby satisfying the right to confrontation.

As for defendant's claim that trial counsel should have sought to strike Lui's testimony, the People argue defendant cannot demonstrate deficient performance, because "there was an obvious tactical reason": "Lui was a[ ] . . . hostile witness" whose "testimony did more harm than good to the prosecution."

Finally, the People contend any error by the trial court was harmless.

We conclude any error by the trial court in connection with defendant's statutory claim was harmless, and defendant's constitutional claim fails because there is no record on which to decide it, given counsel's choice to forego cross-examination of Lui.

I

*No issue preclusion*

Issue preclusion "prevents relitigation of previously decided issues," and can be "raised by one who was not a party or privy in the first suit." "[I]ssue preclusion applies (1) after final adjudication (2) of an identical issue (3) actually litigated and necessarily decided in the first suit and (4) asserted against one who was a party in the first suit or one in privity with that party." (*DKN Holdings LLC v. Faerber* (2015) 61 Cal.4th 813, 824-825.)

We agree with the People that the doctrine of issue preclusion was inapplicable here, because—even assuming for the sake of argument the doctrine could have applied

8

to multiple rulings in the *same* proceeding below[2]—the trial court decided *different* issues when it (a) held Lui in contempt for willfully disobeying an order to answer questions at trial, and (b) ruled Lui's prior inconsistent statement was admissible pursuant to Evidence Code section 1235.

Given the trial court's order to Lui that he "answer questions asked by attorneys from both sides in this case and . . . do so truthfully and completely," Lui's near-complete refusal to answer the prosecutor's questions opened him up to contempt of court. But that contemptuous conduct did not definitely answer the question whether—despite the *near*-complete refusal substantively to answer the prosecutor's questions—Lui's "I don't even recall what I had for breakfast" statement (in reply to the prosecutor's question if he recalled what happened in February 2017) was a deliberate evasion amounting to an implied inconsistency with a prior statement to police.

## II

### *The statutory claim*

Evidence Code section 1235 provides: "Evidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with his testimony at the hearing and is offered in compliance with Section 770."

Evidence Code section 770 provides: "Unless the interests of justice otherwise require, extrinsic evidence of a statement made by a witness that is inconsistent with any part of his testimony at the hearing shall be excluded unless: [¶] (a) The witness was so examined while testifying as to give him an opportunity to explain or to deny the

---

[2] But see *People v. Santamaria* (1994) 8 Cal.4th 903, 913 (because "[t]he high court has never suggested the doctrine" of collateral estoppel "applies to the same proceeding," but rather "has consistently stated it applies to 'successive prosecutions' " "we question whether collateral estoppel applies to the *same* proceeding").

9

statement; or [¶] (b) The witness has not been excused from giving further testimony in the action."

"Ordinarily, a witness's inability to remember an event is not inconsistent with that witness's prior statement describing the event. [Citation.] When, however, 'a witness's claim of lack of memory amounts to deliberate evasion, inconsistency is implied. [Citation.] As long as there is a reasonable basis in the record for concluding that the witness's "I don't remember" statements are evasive and untruthful, admission of his or her prior statements is proper.' [Citations.]" (*People v. Rodriguez* (2014) 58 Cal.4th 587, 633.)

*Harmless error*

If there is state law error, we must reverse a conviction if it is reasonably probable the defendant would have obtained a more favorable result absent the error. (*People v. Hernandez* (2011) 51 Cal.4th 733, 745, citing *People v. Watson* (1956) 46 Cal.2d 818, 837.)

Improper admission of prior statements for their truth under Evidence Code section 1235 is error under state law, subject to *Watson* harmless error review. (*People v. Arias* (1996) 13 Cal.4th 92, 153.)

" 'The harmless-error doctrine . . . "recognizes the principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence, . . . and promotes public respect for the criminal process by focusing on the underlying fairness of the trial." ' " (*People v. Concha* (2010) 182 Cal.App.4th 1072, 1087.)

Courts may consider closing argument when conducting a harmless error review. (Cf. *People v. Flores* (2016) 2 Cal.App.5th 855, 881 [citing *People v. Aguilar* (1997) 16 Cal.4th 1023, 1036 for the proposition that courts should consider closing argument to evaluate harmless error].)

10

*Analysis*

We need not decide the merits of defendant's Evidence Code section 1235 claim, because any error by the trial court was harmless under *Watson*, as it is not reasonably probable defendant would have obtained a more favorable result absent the error.

Here, L.J. testified that on February 4, 2017, after she and defendant fought briefly, she was chasing him through an apartment complex when she heard multiple gunshots after defendant stopped, with his back to her. There were no bullet holes in L.J.'s door before the shooting. A responding officer testified that three bullet holes in L.J.'s front door appeared "fresh." An expert witness testified that the gun found on the ground a few feet away from defendant when he was arrested on February 10, 2017, was the gun that left bullet shell casings found near L.J.'s apartment on February 4, 2017.

Thus, even without Lui's prior statement and trial testimony, the evidence that defendant shot at L.J.'s apartment on February 4, 2017, was extremely strong.[3]

Defendant's contention that the error was *not* harmless—because "Lui's out of court statement was the only eyewitness evidence inculpating [defendant] as the shooter," as L.J. did not see defendant fire the gun at her apartment—is unpersuasive. While, strictly speaking, L.J. may not have been a full eyewitness to the shooting, she was a *percipient* witness to it, as she saw defendant from behind when he stopped running away from her, and then heard multiple gunshots at that moment. (Cf. *People v. Wims* (1995) 10 Cal.4th 293, 302-303 [citing *People v. Jacobs* (1987) 193 Cal.App.3d 375, 381 for the proposition a "firearm is 'used' within meaning of section 12022.5 if victim *senses* its presence and there is threat of use sufficient to produce fear of harm" (italics added)]; *Ra v. Superior Court* (2007) 154 Cal.App.4th 142, 149, fn. 6 [plaintiff may pursue a claim of

---

[3]    In closing argument the prosecutor told the jury that Lui's "piece" of evidence was not necessary to the case, as there was "sufficient evidence" from other sources: L.J.'s testimony, the surveillance footage, and the ballistics evidence.

negligent infliction of emotional distress as a bystander even if plaintiff "did not see" the fatal event in which a spouse died, as long as plaintiff is "a percipient witness to the accident"].)

Accordingly, any error by the trial court was harmless.[4]

### III

### *The confrontation clause claim*

Invoking the proposition a defendant is denied his or her Sixth Amendment right to confrontation when testimonial out-of-court statements "are presented at trial without the opportunity to confront and cross[-]examine the witness who made those statements because the witness is not present in court," defendant cites *People v. Giron-Chamul* (2016) 245 Cal.App.4th 932, 965-966 (*Giron-Chamul*), for the propositions that "[u]navailability of a witness who cannot or will not testify is not removed simply because the witness was able to answer some . . . questions," as the " 'determinative' " issue is whether a defendant had " ' " 'a full and fair opportunity' " to test the witness's knowledge and credibility before the jury.' "

In *Giron-Chamul*, the court held that the victim's refusal to answer questions on cross-examination denied the defendant his constitutional right to confrontation. (*Giron-Chamul, supra*, 245 Cal.App.4th at p. 961.)

But the court in *Giron-Chamul* expressly distinguished the scenario it faced with one in which "the defendant had an opportunity for cross-examination but chose to forgo it as a matter of strategy. (Cf. *State v. Nyhammer* (2009) 197 N.J. 383 [no record on which to decide whether confrontation clause violated because defense counsel chose not

---

**4** This conclusion also resolves defendant's claim that trial counsel was ineffective by failing to move to strike Lui's testimony, because even if there was deficient performance, there was no prejudice.

12

to cross-examine child on her accusations after she was unresponsive on direct].)" (*Giron-Chamul, supra*, 245 Cal.App.4th at pp. 964-965.)

In the case *Giron-Chamul* cited in making that distinction, *State v. Nyhammer*, the New Jersey Supreme Court explained: "That counsel decided to forgo critical cross-examination because of [the witness's] unresponsiveness to many questions on direct does not mean that defendant was denied the opportunity for cross-examination. . . . [Citation.] We cannot presume that [the witness] would have remained silent or unresponsive to questions defense counsel never asked. [Citation.] [¶] We do not fault defense counsel for not pursuing cross-examination that may have damaged defendant's case. Having chosen that strategic course, however, defendant cannot now claim that he was denied the opportunity for cross-examination. Quite simply, *defendant has not made out the fundament for a constitutional challenge under the* [c]*onfrontation* [c]*lause of* . . . the Sixth Amendment." (*State v. Nyhammer*, supra, 197 N.J. at p. 414, italics added.)

Here, defense counsel chose not to cross-examine Lui after he was largely unresponsive on direct, responding to the trial court's query whether counsel wanted to conduct cross-examination with: "Not based on this."

Thus *Giron-Chamul* is distinguishable, because here defendant "has not made out the fundament" for his confrontation clause argument.

DISPOSITION

The judgment is affirmed.

/s/
RAYE, P. J.

We concur:

/s/
HULL, J.

/s/
RENNER, J.

13