Filed 3/13/13  P. v. Lynn CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>      v.<br><br>CALVIN SYLVESTER LYNN,<br><br>      Defendant and Appellant. | C065778<br><br>(Super. Ct. No. 09F01642) |

A jury found defendant Calvin Sylvester Lynn guilty of the first degree murder of his brother Lawrence Lynn.[1]  (Pen. Code, § 187, subd. (a).)[2]  In a bifurcated proceeding, the trial court found true an allegation defendant had a prior "strike" conviction within the meaning of the three strikes law.  (§§ 667, subds. (b)-(i), 1170.12.)  The trial court sentenced defendant to an aggregate term of 50 years to life in state prison, consisting of 25 years to life for murder, doubled for the prior strike conviction.

---

[1]  We shall refer to Lawrence and other members of defendant's family by their first names, not from disrespect, but to avoid confusion.

[2]  Further undesignated statutory references are to the Penal Code.

1

Defendant appeals, contending (1) the trial court prejudicially erred in excluding evidence of Lawrence's drug use and drug lifestyle to establish "potential third party involvement" in the murder, (2) there is insufficient evidence to support the jury's finding of premeditation and deliberation, and (3) the trial court erred in denying his posttrial petition for confidential juror information without conducting a hearing on the issue. Finding no error, we shall affirm.

FACTUAL AND PROCEDURAL BACKGROUND[3]

Defendant and Lawrence were brothers who, along with their five siblings, grew up in their mother's home on Dry Creek Road in Sacramento. Prior to her death, their mother indicated that she wanted her daughter Dolores "to be in charge of her Will regarding control of the Dry Creek house" because Dolores "was already taking care of her and . . . her personal business." Defendant became angry, and their mother "didn't proceed with it." Consequently, their mother did not execute any testamentary document devising the house to anyone. Lawrence was living with their mother in the Dry Creek house at the time of her death in 2001 and continued to reside in the house until he was murdered there in August 2007. Lawrence had a cocaine habit. He received Supplemental Security Income (SSI) benefits and earned additional money recycling.

Over the years, defendant made it clear that he wanted Lawrence out of the house and to take control of the house himself. In or about 2004, defendant told Dolores that Lawrence was using drugs, and that he wanted to put Lawrence in a rehabilitation program. He also told her that he wanted to raise his children, who were then placed in foster care, in the house. He made similar statements to others over the years. In December 2005, he wrote in his journal about being "commanded to take control of my

---

[3] Since the issue before us, at least in part, is whether there is sufficient evidence to support the jury's finding of premeditation and deliberation, the facts are set forth in the light most favorable to the People. (*People v. Felix* (2009) 172 Cal.App.4th 1618, 1624.)

2

house on Dry Creek Road"; in January 2006, he wrote that he had "decided to go take [the house] by physical force" and "thank[ed] God for Calvin Lynn, Jr., who thought it was wrong"; and in April 2006, he wrote that "the house I was raised in is now ready for me to control" and asked God "to enable me to take control" of it.

In March 2007, defendant rented two rooms in the house to a woman and told her that while Lawrence was currently living in the house, he would be "moving out very shortly." The woman and her daughter lived in the house until June 2007. During the time they lived there, defendant entered the house unannounced two or three times a week. Nearly every time he stopped by he asked Lawrence when he was moving out, demanded Lawrence pay him rent, and told Lawrence "this is my house." Lawrence told defendant he was not leaving and "[t]his is my house." On at least one occasion, defendant told Lawrence that "[h]e was going to do whatever it took to get him out of the house."

Just prior to Lawrence's murder, defendant learned that the house he was living in on Buckboard Road in Rio Linda was going to be sold, and he was going to have to move.

A few days prior to Lawrence's murder, defendant's and Lawrence's nephew James, who lived down the street from the Dry Creek house, saw defendant walking back and forth in front of the house. Defendant was agitated and said Lawrence had stolen some tools. When James passed the house the following morning, he did not see Lawrence out front. Normally, Lawrence was out front in the mornings getting ready to turn in his recycling. Lawrence's shopping cart, which he used to do his recycling, was also missing. James knocked on the door, but no one answered.

On or about the same day, defendant told his longtime live-in girlfriend and mother of his children, "I'm going to kick [Lawrence's] ass for . . . letting somebody . . . steal my tires off my car." Defendant was "real mad." That is why his girlfriend "kind of

3

flipped out when ain't nobody seen [Lawrence] the next day." Defendant was gone a few hours, and when he returned, he was "[d]istant" and in "his own little world."

On August 22, 2007, Lawrence's body was discovered in the backyard of a nearby vacant home on South Avenue. It was wrapped in a blanket. There also was a shopping cart in the backyard that was not there a few days earlier. Lawrence's pants' pockets were turned out, and his wallet was missing. Law enforcement was not able to identify his body until the following afternoon.

Law enforcement went to the Dry Creek house at approximately 8:00 p.m. on August 23, 2007, but did not begin searching the house until early following morning. The blood evidence inside the house suggested that Lawrence was beaten in the front room and his bedroom. There was "cast off" spatter on the living room curtains consistent with blood being cast off of a bat or other weapon as it was being swung. There was also blood on the arm of a loveseat, a table, and on a pillow located in the front room. A blood stained baseball bat was found next to the loveseat, and Lawrence's blood was found on the "tip" end of the bat. There also were large blood stains on Lawrence's bedroom carpet, "impact spatter" on the walls, a pool of blood on a phone book, and blood and tissue on some other books. The blood stains on the carpet were covered in paint. There was a trail of blood from the house on Dry Creek to South Avenue.

As defendant's and Lawrence's nephew James walked home from the bus stop on August 23, 2007, he saw defendant ride past the Dry Creek house on his bike. James could see police lights and asked defendant "what was going on on Dry Creek." Defendant said he did not know and rode off. Defendant seemed agitated and in a hurry.

A pair of size 13 shoes was found inside a trash bag in defendant's garage in Rio Linda. Lawrence's blood was found on the shoes, along with paint that was indistinguishable from that found on the bedroom carpet at the Dry Creek house. The blood and paint were wet when they came into contact with the shoes. A fiber embedded

4

in a bloodstain on one of the shoes matched the fibers of the blanket that was wrapped around Lawrence's body.

The cause of Lawrence's death was blunt force injuries to his head and chest. He had been struck at least five times in the head and at least three times on his right side. His right forearm was fractured, as well as the metacarpals associated with the ring and little fingers on the right hand. Cocaine metabolite was found in his skeletal muscle, indicating he likely used cocaine in the recent past.

When defendant discussed with his girlfriend that Lawrence had been murdered, he looked at her with "a smirky ass little grin." One of the last entries in defendant's journal prior to it being seized reads: "Thank you, Father, for directing my path always, and especially on this one particular day when I asked you for your guidance and direction. Up until that special day, there has never been such an enormous act of faith in my life. Now, as I sit here in my . . . living room two weeks later, I'm sure Father, that I've accomplished His will because God cannot fail."

Defendant moved into the Dry Creek house soon after Lawrence's murder.

DISCUSSION

I

The Trial Court Properly Excluded Evidence of Lawrence's Drug Use as a Basis for Establishing Third Party Culpability

Defendant first contends that "[t]he trial court erred under the Fifth, Sixth and Fourteenth Amendments, and under California law, in ruling that evidence of [Lawrence's] drug use and drug lifestyle could not be relied upon by the defense as evidence of potential third party involvement in the homicide, where the prosecution's case was entirely circumstantial." We disagree.

Prior to trial, defendant sought to introduce evidence of Lawrence's drug addiction, drug lifestyle, drug friends and related matters to show that "the problems [defendant] was having with [Lawrence] had to do with" Lawrence's cocaine addiction

5

and not defendant's desire to have the house for himself.  Defendant also argued that "[t]he fact [Lawrence] had cocaine in his tissue shows that at least some time prior to his death . . . he was . . . using cocaine and had to buy it somewhere.  He may have been with someone; the pockets in his pants were turned out.  His wallet was missing.  There was evidence that he was using cocaine in the home."

The trial court ruled that the proposed evidence was inadmissible, except as it might reflect upon defendant's motive or lack of motive to harm Lawrence.  The court explained that "[t]here has [to be] some direct or circumstantial evidence connecting that third party to the commission of this offense" and "[t]he very general statements [the defense has made], and based on what I've heard thus far, you aren't even close to [that] hurdle."  Defendant conceded, through his counsel, "I don't think I have any evidence like that at this point."

It is well established that " 'third-party evidence need not show "substantial proof of a probability" that the third person committed the act; it need only be capable of raising a reasonable doubt of defendant's guilt.' [Citation.]" (*People v. Edelbacher* (1989) 47 Cal.3d 983, 1017 (*Edelbacher*).)  It is equally well established, however, that " 'evidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt:  there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime.' [Citation.]" (*Ibid.*)

In *Edelbacher*, the defendant's trial counsel sought to introduce evidence the victim sold marijuana and " 'had been running around with some Hell's Angel-type people' " " 'to show by circumstantial evidence the possible motive of third parties to commit the crime . . . .'  Counsel argued that 'people who are dealing in narcotics frequently end up injured or shot.' " (47 Cal.3d at p. 1017-1018.)  The court held that the proposed evidence was properly excluded because it "did not identify a possible suspect other than defendant or link any third person to the commission of the crime.  The

6

evidence did not even establish an actual motive but only a possible or potential motive for [the victim's] murder. . . . [E]vidence of a third party's motive, without more, is inadmissible. A fortiori, evidence showing only a third party's possible motive is not capable of raising a reasonable doubt of a defendant's guilt and is thus inadmissible." (*Id.* at p. 1018.)

The same is true here. The proposed evidence did not identify a possible subject other than defendant or link any third person to the commission of the crime. Nor did it establish an actual motive but only a possible or potential motive for Lawrence's murder. Accordingly, the trial court properly excluded it to the extent it was offered to establish someone other than defendant murdered Lawrence.

In his reply brief, defendant insists he was "not trying to establish another individual's guilt but to demonstrate that the prosecutor's circumstantial evidence case [was] insufficiently persuasive to establish beyond a reasonable doubt that [he] was responsible." He claims that "the jury should have been allowed to consider [Lawrence's] involvement with criminals and criminal activity as it weighed on the strength of the circumstantial evidence pointing to [defendant] as the slayer."

To show that defendant was not the "slayer" is to argue that a third party was responsible for Lawrence's murder. Defendant acknowledges as much in his reply brief, wherein he asserts that he was precluded from relying on the proposed evidence for "its most important purpose: to call into question the strength of the prosecution's circumstantial evidence case by addressing the question of *what other persons might have been responsible*." (Italics added.) This is precisely the type of nonspecific evidence our Supreme Court concluded was inadmissible in *Edelbacher, supra,* 47 Cal.3d at pp. 1017-1018. Accordingly, the trial court did not err in excluding it as a basis for establishing someone other than defendant killed Lawrence.

## II
## The Jury's Finding of Premeditation and Deliberation is Supported by Sufficient Evidence

Defendant next contends that his first degree murder conviction must be reversed because the jury's finding of premeditation and deliberation is not supported by sufficient evidence. Again, we disagree.

In reviewing a challenge to the sufficiency of the evidence, our "task is to determine whether, in light of the whole record viewed in the light most favorable to the prosecution, a rational trier of fact could have found the elements of the crime beyond a reasonable doubt." (*People v. Felix* (2009) 172 Cal.App.4th 1618, 1624.) We " ' "must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.]" ' [Citations.]" (*People v. Smith* (2005) 37 Cal.4th 733, 739.) "The credibility of witnesses and the weight accorded the evidence are matters within the province of the trier of fact. [Citations.]" (*People v. Ramos* (2004) 121 Cal.App.4th 1194, 1207.) We " 'must accept logical inferences that the jury might have drawn from the evidence even if the court would have concluded otherwise. [Citation.]' [Citation.]" (*People v. Halvorsen* (2007) 42 Cal.4th 379, 419.) "Reversal on this ground is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

" 'A verdict of deliberate and premeditated first degree murder requires more than a showing of intent to kill. . . . "Deliberation" refers to careful weighing of considerations in forming a course of action; "premeditation" means thought over in advance. [Citations.] "The process of premeditation and deliberation does not require any extended period of time. 'The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold,

8

calculated judgment may be arrived at quickly.' [Citations.]" ' [Citation.]" (*People v. Young* (2005) 34 Cal.4th 1149, 1182.)

In *People v. Anderson* (1968) 70 Cal.2d 15, our "Supreme Court described the categories of evidence relevant to premeditation and deliberation that have been found sufficient to sustain convictions of first degree murder: '(1) facts about how and what defendant did prior to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing-what may be characterized as "planning" activity; (2) facts about the defendant's prior relationship and/or conduct with the victim from which the jury could reasonably infer a "motive" to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that the killing was the result of "a pre-existing reflection" and "careful thought and weighing of considerations" rather than "mere unconsidered or rash impulse hastily executed" [citation]; (3) facts about the nature of the killing from which the jury could infer that the manner of killing was so particular and exacting that the defendant must have intentionally killed according to a "preconceived design" to take his victim's life in a particular way for a "reason" which the jury can reasonably infer from facts of type (1) or (2).' [Citation.]" (*People v. Concha* (2010) 182 Cal.App.4th 1072, 1084, italics omitted)

"This framework does not establish an exhaustive list of required evidence that excludes all other types and combinations of evidence that may support a jury's finding of premeditation [citation], nor does it require that all three elements must be present to affirm a jury's conclusion that premeditated murder was intended. [Citations.]" (*People v. Felix*, *supra*, 172 Cal.App.4th at p. 1626.)

Here, there is sufficient evidence from which the jury could infer premeditation. There is ample evidence defendant wanted the house for himself, and that Lawrence refused to leave. Defendant told friends and family that he wanted the house and wrote about "taking" the house in his journal. He and Lawrence argued about the house on

9

numerous occasions. The circumstances of Lawrence's murder also support an inference of premeditation. There is evidence Lawrence sustained five blows to the head and three blows to his chest with a baseball bat. There also is evidence the attack took place in the front room and Lawrence's bedroom, and there was absolutely no evidence that Lawrence fought back, only that he attempted to shield himself with his arms. Based on the evidence presented, the jury reasonably could infer that after striking defendant in one room, defendant followed him to a second and continued his attack. Thus, even if the initial blow or blows were spontaneous, defendant had time to reflect upon his actions when Lawrence attempted to flee into another room. That defendant followed after him is "indicative of a reasoned decision to kill." (*People v. Perez* (1992) 2 Cal. 4th 1117, 1129.) Moreover, the vicious and sustained nature of the attack -- repeated forceful blows to the head and body with a baseball bat -- provided the jury with ample evidence to find defendant acted with a premeditated and deliberate intent to kill. (*People v. Silva* (2001) 25 Cal.4th 345, 369 ["The manner of killing -- multiple shotgun wounds inflicted on an unarmed and defenseless victim who posed no threat to defendant -- is entirely consistent with a premeditated and deliberate murder"].)

Accordingly, the jury's finding of premeditation and deliberation is supported by sufficient evidence.

III

The Trial Court Did Not Err in Denying Defendant's Petition for Confidential Juror Information Without Holding an Evidentiary Hearing

Finally, defendant claims "[t]he trial court applied the incorrect standard and erred in refusing to hold a hearing . . . on . . . confidential juror information." He is mistaken.

Following the trial, defendant filed a petition seeking confidential juror information, which the prosecution opposed. The petition was supported by an affidavit of a defense investigator summarizing his interview of a juror that occurred immediately after the jury rendered its verdict. The investigator summarized the juror's statements as

follows: "This was a difficult and emotionally trying case on all of us. We all had strong opinions and different personalities. The decision we reached, we did not come upon lightly. I believe that we as a jury reached the right decision. The District Attorney was able to present evidence that physically proved and placed the defendant at his brother's house. She presented a very strong and convincing case that it was the defendant who committed this murder. The Defense Attorney was not able to provide physical evidence or credible witnesses that could [prove] that the defendant was not . . . at his brother's house when the homicide occurred, nor could he prove that it was not the defendant [that] killed his brother. We read and re-read the witnesses' statements; we reviewed the physical evidence and we deliberated over this case before we came to our final decision."

Defendant argued that it could be inferred from the juror's statements, as summarized in the affidavit, that the jury found defendant "failed to prove he was innocent, essentially." According to defendant, if the jurors had that sort of discussion during deliberations, "that would be a violation of their duty because they wouldn't be following the law with regard to the presumption of innocence or the burden of proof."

The trial court rejected defendant's argument and denied the petition without setting the matter for a hearing, explaining that "once the People have produced [what the juror] characterizes [as] overwhelming evidence in the case in chief of [defendant's] guilt, it does in some ways become incumbent on the defense, if they don't want their client convicted, to produce something that instills that reasonable doubt." The trial court interpreted the juror's statements, as summarized in the affidavit, as stating just that, and not that defendant was required to prove his innocence as defendant had argued. The court concluded that "[t]here is simply nothing in the declaration that reflects that the jury did anything other than conscientiously review the evidence, follow the court's instructions, [and] consider the evidence carefully . . . . [¶] It indicates that they believed the evidence was overwhelming, both the physical evidence and other evidence presented

11

by the People. And that in considering the totality of the evidence that was presented in the case, the jurors' [*sic*] believed that the ultimate verdict in the case was still the appropriate one in light of all the evidence that they heard. [¶] . . . In other words, they did precisely what you would ask of jurors." The court also noted that "[t]he requirements of . . . a [Code of Civil Procedure section] 237 claim require that you demonstrate good cause," and that "if [the affidavit] is what is required to demonstrate goods [*sic*] cause, good cause has no meaning at all."

" 'It is not uncommon at the conclusion of a criminal trial for the attorneys representing a convicted defendant to attempt to contact the jurors to discuss the case with them. This procedure is usually employed in an effort to learn of juror misconduct or other information that might provide the basis for a motion for a new trial.' [Citation.] While counsel may wish to inquire whether misconduct prejudiced their clients, jurors often want to keep their contact information confidential. 'Discovery of juror names, addresses and telephone numbers is a sensitive issue which involves significant, competing public-policy interests.' [Citation.]

"Trial courts have broad discretion to manage these competing interests by allowing, limiting, or denying access to jurors' contact information. [Citations.] The Legislature has supplemented the protection of jurors' personal information by enacting Code of Civil Procedure section 206.

"Code of Civil Procedure section 206 codifies the prerogative of jurors to discuss the case after trial as well as their right not to talk with the parties. Nothing in section 206 compels a reluctant juror to speak with any of the parties, their counsel, or investigators. 'If any juror refuses to consent, that is the end of the matter.' [Citation.]

"As this court has previously noted, 'counsel and investigators routinely interview jurors before they leave the courthouse.' [Citation.] However, counsel may not always have the opportunity to discuss the case right away. When counsel speak with jurors more than 24 hours after conclusion of a criminal trial, subdivision (c) of Code of Civil

12

Procedure section 206 requires the attorneys themselves to remind jurors about their absolute right not to discuss the case with them.

"If counsel cannot locate the jurors with whom they wish to speak, they can avail themselves of provisions in Code of Civil Procedure section 237 for access to jurors' contact information." (*People v. Tuggles* (2009) 179 Cal.App.4th 339, 380-381, fn. omitted.)

Code of Civil Procedure section 237 provides in pertinent part: "Upon the recording of a jury's verdict in a criminal jury proceeding, the court's record of personal juror identifying information of trial jurors . . . shall be sealed until further order of the court as provided by this section." (*Id.,* subd. (a)(2).) "Any person may petition the court for access to these records. The petition shall be supported by a declaration that includes facts sufficient to establish good cause for the release of the juror's personal identifying information. *The court shall set the matter for hearing if the petition and supporting declaration establish a prima facie showing of good cause for the release of the personal juror identifying information . . . ."* (*Id.,* subd. (b), italics added.)

"Denial of a petition filed pursuant to Code of Civil Procedure section 237 is reviewed under the deferential abuse of discretion standard." (*People v. Carrasco* (2008) 163 Cal.App.4th 978, 991.)

Here, the trial court did not abuse its discretion in determining that defendant failed to make a prima facie showing of good cause. It made an express finding that "[t]here is simply nothing in the declaration that reflects that the jury did anything other than conscientiously review the evidence, follow the court's instructions, [and] consider the evidence carefully . . . ." The record supports the court's finding. While defendant is correct that he was not required to prove his innocence, when viewed in context, the juror's statements, as summarized by the investigator, do not indicate that the juror found defendant guilty because he failed to prove his innocence, but rather because the

13

prosecution "presented a very strong and convincing case," which defendant failed to contradict.

To the extent defendant contends the trial court erred in making a discretionary good cause determination, when only a prima facie showing of good cause was required at that stage of the proceeding, any error was harmless. Given the trial court's finding that "[t]here is simply nothing in the declaration that reflects that the jury did anything other than conscientiously review the evidence" and statements about the total absence of good cause, we conclude there is no chance the trial court would have found defendant established a prima facie case of good cause, assuming for argument's sake that it failed to make such a determination below.

DISPOSITION

The judgment is affirmed.


      BLEASE      , Acting P. J.


We concur:


    NICHOLSON    , J.


    MURRAY    , J.