Filed 3/24/21  P. v. Proctor CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>JEQUERIE CHEMOND PROCTOR,<br><br>        Defendant and Appellant. | A160119<br><br>(Contra Costa County<br>Super. Ct. No. 05-191902-6) |

Defendant Jequerie Chemond Proctor was convicted of street terrorism and multiple other offenses with gang enhancements after he and his fellow gang members evaded the police during a car chase and discarded loaded firearms from their car.  On appeal, he contends his street terrorism conviction and gang enhancements should be reversed because the trial court erred in answering a question from jurors about the predicate offenses necessary to prove those allegations.  He also contends the trial court erroneously denied his mistrial motion based on the court's inadvertent statement identifying defendant during the testimony of a gang expert.  We affirm, and direct the trial court to prepare an amended minute order and abstract of judgment to correct errors identified by the Attorney General on appeal.

# I. BACKGROUND

On October 9, 2019, the Contra Costa County District Attorney filed an information charging defendant with conspiracy to possess a loaded and unregistered firearm (Pen. Code,[1] §§ 182, subd. (a)(1), 25850, subds. (a), (c)(6); count 1); possession of a firearm by a felon (§ 29800, subd. (a)(1); count 2); carrying a loaded, unregistered handgun (§ 25850, subd. (a); count 3); fleeing a pursuing peace officer's motor vehicle while driving recklessly (Veh. Code, § 2800.2; count 4); and street terrorism (§ 186.22, subd. (a); count 5). With respect to the first four counts, the information alleged that defendant committed the crimes for the benefit of, at the direction of, and in association with a criminal street gang. (§ 186.22, subd. (b)(1)(A).)

## A. *The 2018 Police Chase*

In the early evening of August 14, 2018, Richmond Police Officer Orlando Guzman was driving in his police vehicle when a black Honda Accord with tinted windows throughout the car and paper plates caught his attention. Other vehicles were nearby, including "a blue two-door Camry" behind the Accord and a Mercedes SUV or sedan. Guzman followed the Accord and was "able to get directly behind" it "[w]hen it got to B Street and Barrett Avenue," about four blocks from 5th Street. Guzman activated his "solid forward facing red light and emergency lights." The Accord did not stop but made a left turn.

Guzman followed the Accord, turning his siren on and off multiple times to get the driver's attention, but the Accord still did not stop. At one point, Guzman "noticed that the left rear door cracked open and then the door

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

2

closed again." The Accord ran a red light when turning onto Macdonald Avenue, and sped up to 40 miles per hour (mph) in a 25 mph zone. Guzman continued behind the Accord with his siren on.

The Accord came to an intersection, ran the stop sign, and continued speeding away from Guzman, gaining distance on him. After the Accord failed to yield at two more stop signs, Guzman decided to stop his pursuit of the Accord because the Accord was driving recklessly and he did not want anyone to get hurt. Guzman continued driving in the same direction, but turned off his lights and sirens and "let the other units in the area know what direction the [Accord] went in." Guzman saw the Accord turn from Macdonald Avenue onto 15th Street.

Around 6:40 p.m., Brian S. was working at an automotive repair shop when he heard a car speeding around the corner with its tires squealing. He went to see what was going on, and saw a dark, four-door car with tinted rear windows speeding down 15th Street. He saw a hand throw a gun out of the car window, and saw the gun going through the air. The gun then hit a vehicle and slid underneath it. Brian S. saw the gun under the car and unspent rounds of ammunition scattered around near it.

Brian S. went over to his neighbor Emmett Z.'s business across the street to see if his surveillance camera had recorded anything. Emmett Z. had heard a "fast car going by and some loud noises." He "thought there was a car wreck" because he heard metal hitting metal and metal hitting the ground. Emmett Z. saw a firearm laying in the gutter and called the police.

About 10 minutes after Brian S. saw the gun thrown from the Accord, Brian S. and Emmett Z. saw a red Honda Del Sol drive "slowly" down the street, with only the driver in the car. Emmett Z. testified that the Del Sol slowed down in front of his business while the driver looked at the firearm.

3

The car went in reverse, then forward again, and "possibly around the block, because they came back." Emmett Z. told the driver something to the effect of, "Get the hell out. You don't belong here."

The red Dol Sol returned to the scene a second time about a minute and a half later, then returned a third time, three to four minutes later. Emmett Z.'s surveillance camera showed it driving down 15th Street. Emmett Z. testified that the third time the Del Sol drove by, "[i]t was the same driver as before." He saw the car reverse course because police officers were on the scene and "started to approach."

Guzman responded to the call placed by Emmett Z. and arrived at his business on 15th Street. Guzman spoke with Emmett Z., who showed him the video surveillance footage, which was also played for the jury at trial. While he was on the scene, Guzman saw the Del Sol drive by, and recognized the driver as Rohnell Robinson. The Del Sol was the same vehicle that appeared in Emmett Z.'s surveillance footage.

Guzman found a semi-automatic, .40-caliber Glock 23 Generation 4 firearm, its magazine, and live ammunition under a car in the street. After watching Emmett Z.'s video, officers noticed that two firearms had been discarded from the car at the same time. Officer Joanna Grivetti found the second firearm—a semi-automatic, .40-caliber Glock 27—discarded about two houses away. Inside the second firearm was a 15-round-capacity magazine with 14 rounds of .40-caliber bullets. The magazine contained 14 rounds of ammunition. Both guns were "real" and designed to fire live ammunition.

About 6:42 the same evening, Officer Ben Wagnon responded to an address on 18th Street. Wagnon heard a report over the police radio that occupants of a red Honda sedan may have thrown firearms and then attempted to retrieve them. As he was approaching the area, he saw a red

4

Honda sedan coming toward him. He stopped the vehicle, a red Del Sol. Defendant sat in the front passenger seat and Rohnell Robinson was in the driver's seat. Wagnon noticed that there was "a significant amount of paperwork" in the front seat where defendant was sitting, and he was sitting on "a large book." Wagnon found it odd that someone would choose to sit on all of that rather than take the time to set it aside.

Wagnon arrested defendant and searched him. Officer Joanna Grivetti arrived and helped search the Del Sol, which did not contain any firearms or ammunition. Grivetti later went to the scene on 15th Street, where she collected the two discarded firearms.

Grivetti next went to a location on 18th Street where officers had located the unoccupied Accord involved in the police chase. The Accord was located about three blocks away from where the firearms found on 15th Street and about two blocks from where officers had stopped the Del Sol. Inside the Accord, Grivetti found gloves, shoes, a mask, paperwork, a black knit cap, and two sweatshirts. One sleeve of each sweatshirt was turned inside out. Grivetti testified that the state of the sleeves suggested someone was in the process of removing his or her clothing. The Accord was registered to Jonathan Shaw.

### B. Identity Evidence

After investigating the scene at 15th Street, Guzman obtained closed circuit television (CCTV) footage of his initial contact with the Accord with paper plates, the Toyota Camry, and the Mercedes on the 400 block of 5th Street. In the footage, Guzman saw the red Del Sol. The video showed someone wearing a red-and-black Air Jordan jacket and "light brown and gray" jeans approach the driver's side of the Del Sol. The person wearing the jeans and Air Jordan jacket then approached the Accord, entered the driver's

5

side, and drove off. The video showed Guzman in his police car, attempting to catch up to the Accord. Police never recovered the Air Jordan jacket.

Before watching the CCTV footage, Guzman had visited defendant in jail. When he watched the video, Guzman noticed similarities between defendant and the individual who got in the Accord, including that both people had "[s]hort hair," "[a]ppeared to be clean shaven," and "had a muscular, athletic build, which is pretty distinct." When Guzman saw defendant in jail, he was wearing "light gray and light brown" jeans, black-and-white shoes, and a gray hoodie, and "appeared to match the physical characteristics and the clothing from the waist down" of the person he saw getting into the driver's seat of the Accord in the CCTV footage.

Officer Matthew Anderson was familiar with both defendant and Rohnell Robinson. Anderson had contacted Robinson probably 40 to 50 times and had arrested him "on a few occasions," and had seen defendant 40 to 50 times before trial. Anderson reviewed the CCTV footage from the 400 block of 5th Street and still photos from the footage. He identified defendant as the individual in the video getting out of a blue Toyota Camry. Anderson testified defendant approached the red Del Sol, reached inside, appeared to "discretely obtain[ ]" a firearm from Robinson in the Del Sol, and "appeared to take it and put it into his waistband area." Anderson then saw defendant and Jonathan Shaw walk away from the Del Sol and get in the Accord. Defendant got in the driver's side of the Accord.

A latent fingerprint on the Accord's interior driver's side door handle matched defendant's left middle finger.

## C. Gang Evidence

Officer Anderson testified as a gang expert. He was a detective in the gang unit from 2011 to 2014, and from 2015 to 2017, was assigned to the FBI

6

Safe Streets Task Force, on which he investigated violent gang activity throughout Contra Costa County, with a specific emphasis on Richmond and West Contra Costa County. Anderson's was mainly assigned to Central Richmond, where the principal gang was the "Deep C" criminal street gang (Deep C). Anderson had "conducted hundreds of investigations" into the Deep C criminal street gang.

Deep C's primary activities include the possession of narcotics for sale, possession of illegal, unregistered and loaded firearms, burglaries, robberies, and firearm assaults, up to and including murder. Anderson affirmed that each of those activities is listed in section 186.22, subdivision (e), which "lays out the laws behind the criminal street gang enhancements and criminal street gang active participation."

Anderson also testified, among other things, about the importance of guns to criminal street gangs. He emphasized that firearms are used by the gang to protect themselves and their territory, to allow them to commit assaults, shootings and homicides, and conduct robberies, which allows them to gain revenue and demonstrate power. The gangs also use firearms "to instill fear within their communities" and prevent cooperation with law enforcement. Anderson explained that gangs often have "gang gun[s]," i.e., firearms shared among gang members, because they are very expensive on the streets. Thus, gang members share guns to commit crimes, "defend themselves," and "commit any types of retaliatory acts to gain their power and respect in the gang world."

## D. Conviction and Sentencing

On November 19, 2019, a jury found defendant guilty as charged and found the gang enhancements true. Defendant was sentenced to a term of six

years for the offenses in this case, plus one year four months for unrelated charges in Orange County, for a total of seven years four months in prison.

## II.  DISCUSSION

### A.  *Predicate Offenses*

Defendant first contends the trial court committed reversible error by failing to properly respond to a question from the jury about the timing of the predicate offenses on the section 186.22, subdivision (a) charge and gang enhancement allegations.  For reasons we will explain, we disagree.

#### 1.  *Additional Background*

At trial, Officer Anderson testified to several prior convictions of Deep C gang members.

Deep C gang member Enacio Bolton was convicted of possessing a loaded, concealed firearm (§ 29800) with a section 186.22, subdivision (b)(1) gang enhancement.  Bolton committed the offense on November 12, 2014, for the benefit of or in association with Deep C.

Parrish Rauls, another Deep C gang member, was convicted of being an accessory after the fact (§ 32) with a gang enhancement for an incident in which he was arrested for the possession of a loaded, concealed firearm (§ 29800).  Rauls committed the offense on April 2, 2014, for the benefit of or in association with other Deep C members.

Rohnell Robinson, a Deep C gang member, was convicted of street terrorism (§ 186.22, subd. (a)) as a result of the August 14, 2018 incident at issue in this case, and the offense was committed for the benefit of Deep C.[2]

The jury was instructed on active participation in a criminal street gang with CALCRIM No. 1400, and on the gang enhancement allegations

---

[2] The trial court took judicial notice of the dockets pertaining to Bolton's, Rauls's, and Robinson's offenses.

using CALCRIM No. 1401. CALCRIM No. 1400 instructs the jury, in relevant part, on the requirement that a criminal street gang has members who, "whether acting alone or together, engage in or have engaged in a pattern of criminal gang activity."

A "pattern of criminal gang activity" was defined for the jury to mean:

"1. The (commission of,/ or attempted commission of,/ or conspiracy to commit,/ or solicitation to commit,/ or conviction of: [¶] 1A. any combination of two or more of the following crimes/, or two or more occurrences of one or more of the following crimes: Assaults with Firearms, Robbery, Drug Sales, Murder, Carrying Loaded Firearms, Burglary, Driving Stolen Vehicle, Felon in Possession of a Firearm;

"2. At least one of those crimes was committed after September 26, 1988;

"3. The most recent crime occurred within three years of one of the earlier crimes;

"AND

"4. The crimes were committed on separate occasions or were personally committed by two or more persons."

The jury was also instructed:

"If you find the defendant guilty of a crime in this case, you may consider that crime in deciding whether one of the group's primary activities was commission of that crime and whether a pattern of criminal gang activity has been proved. [¶] You may not find that there was a pattern of criminal gang activity unless all of you agree that two or more crimes that satisfy these requirements were committed, but you do not have to all agree on which crimes were committed."

9

In closing argument, the prosecutor explained to the jury that several possible predicate offenses could be used to establish a pattern of gang-related crimes as required by section 186.22, subdivision (e). He told them:

"The predicates are those prior offenses that were brought into evidence. It was when I asked the judge to take judicial notice of certain convictions, if you recall. And one was from Mr. Robinson. And then two were from two other gentlemen, Mr. Bolton, Mr. Rauls. Right?

"So for Mr. Robinson's conviction the question is whether he only aided and abetted the defendant by bringing the firearms? Or if he also directly acted and directly committed the crime of possessing the firearm. Right? And when he brought the firearm he was fully in possession of a loaded, not registered to him, firearm. He committed the offense. And then the defendant committed the offense as soon as he got it. Right?

"And so when that happens you can consider each of them as separate offenses. And the defendant's conviction in this case, if you find that it was a gang-related incident, you can find that as one of the predicates. And you can find Mr. Robinson's conviction, if it was a separate offense, as a second separate conviction.

"In the alternative, if you find that Mr. Robinson—you don't find that Mr. Robinson's conduct in this case represented a predicate, that you don't think that it was gang-related or that I hadn't proven it correctly, then you can look to the 2014 incidents. And those, the commission of those, incidents where two separate offenders, each possessed firearms illegally, felon in possession of a firearm, and those are each within three years of one another."

The prosecution continued, acknowledging he had "just said a lot of slightly confusing things," but explained, "There are kind of two routes here."

10

First, he said, "is that the defendant's current offense is a gang-related incident. . . . [¶] . . . [¶] So as I was saying, if the defendant's own conduct here is gang-related then it can count as one of the predicates. . . . [¶] Then further for Mr. Robinson's conviction, as long as you find the commission of his offense was not merely aiding and abetting. Meaning, he wasn't just the driver in a bank robbery. Or he wasn't just holding back some—a crowd so that his friend could attack somebody. Right? And so he's aiding and abetting, but he's not actually participating in the conduct. Right?

"In this case that's not what we have. Right? Mr. Robinson is actually possessing the firearm, shown by the DNA that he has on the firearm. The fact that you can see his vehicle where he hands the firearm to [defendant], indicating he possessed it, and then [defendant] possessed it.

"Even if you don't find that that's a separate incident, that Mr. Robinson's case is not its own predicate, the requirement is that it's two within three years of one another.

"So the two 2014 cases involving a felon in possession of firearms, these are both gang-related. That is what Officer Anderson explained to you. These will resolve this issue as well, if you find that—that it's not already resolved by the current case and Mr. Robinson's conviction." The prosecutor then explained that the jury could rely on Bolton's and Rauls's 2014 convictions, explaining, "Either way you go is fine. You just have to—you have to agree that two of these predicates are within three years of one another."

During deliberations, the jury sent a note to the court that said: "Clarification of timing requirements of [CALCRIM No.] 1400. [¶] (1) What does 'most recent crime' mean in establishing pattern of criminal activity? [¶] (2) Is Robinson 2018 conviction the 'most recent crime'?" The court

11

responded: "This is a factual question for the jury to determine based on the testimony of the witnesses and the instructions previously given." The jury also sent a note requesting the "testimony of Officer Anderson regarding convictions of Bolton, Rauls (2014) and Robinson (2018)."

### 2. *Analysis*

Defendant contends the trial court's response to the jury's question about " 'the most recent crime' " was wrong, misled the jury, and prejudiced defendant. Specifically, defendant argues the prosecution could not rely on Robinson's 2018 *conviction* for street terrorism under section 186.22, subdivision (a) as a predicate offense, because it is not one of the offenses that can comprise a pattern of criminal gang activity listed in section 186.22, subdivision (e). When the trial court responded to the jury's question by stating it was a factual question but failed to explain that the jury could not rely on Robinson's *conviction*, defendant contends the jury was confused.

Section 1138 provides, in relevant part, "After the jury have retired for deliberation, . . . if they desire to be informed on any point of law arising in the case, they must require the officer to conduct them into court. Upon being brought into court, the information required must be given . . . ." "The court has a primary duty to help the jury understand the legal principles it is asked to apply. [Citation.] This does not mean the court must always elaborate on the standard instructions. Where the original instructions are themselves full and complete, the court has discretion under section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information." (*People v. Beardslee* (1991) 53 Cal.3d 68, 97.) The court "must at least *consider* how it can best aid the jury. It should decide as to each jury question whether further explanation is desirable, or whether it should merely reiterate the instructions already given." (*Ibid.*; *People v.*

12

*Brooks* (2017) 3 Cal.5th 1, 97.) We review a trial court's alleged failure to properly answer a jury question for abuse of discretion. (*Brooks*, at p. 97; *People v. Hodges* (2013) 213 Cal.App.4th 531, 539.)

We are not persuaded that the trial court abused its discretion in its response to the jury's question here. First, the jury specifically asked for "Clarification regarding the *timing* requirements for [CALCRIM No.] 1400" (italics added), and in that context asked if "Robinson's 2018 conviction" was " 'the most recent crime.' " As the jury was instructed, CALCRIM No. 1400 requires that at least one of the crimes was committed after September 26, 1988, and that the most recent crime occurred within three years of another one of the earlier crimes. During closing argument, defense counsel focused the jury's attention on the timing of the predicate offenses, and defendant does not disagree that the timing is a question of fact for the jury to decide.[3] In light of the jury's focus on the timing aspect of the predicate offenses inquiry under CALCRIM No, 1400, we conclude the trial court did not abuse its discretion in responding that it was a factual question for the jury and referring the jury back to "the testimony of the witnesses and instructions previously given."

Defendant asserts the trial court should have clarified that Robinson's 2018 street terrorism conviction under section 186.22, subdivision (a) could not constitute a predicate offense, but the instructions given to the jury did not contain any reference to street terrorism or section 186.22 in the list of

---

[3] Indeed, we note defense counsel also referred to Robinson's "conviction," arguing that there was "an approximate three year, nine month gap between Mr. Bolton's conviction and Mr. Robinson's conviction," representing "a break in the pattern of criminal gang activity" and expressly referred to the "three convictions," including Rauls's, Bolton's and Robinson's, as potential predicate acts without objecting or explaining that Robinson's 2018 street terrorism conviction could not serve as a predicate act.

predicate crimes the jury could consider. The CALCRIM No. 1400 instruction as given stated that predicate offenses could be: "1. The (commission of,/ or attempted commission of,/ or conspiracy to commit,/ or solicitation to commit,/ or conviction of: [¶] 1A. any combination of two or more of the following crimes/, or two or more occurrences of one or more of the following crimes: Assaults with Firearms, Robbery, Drug Sales, Murder, Carrying Loaded Firearms, Burglary, Driving Stolen Vehicle, Felon in Possession of a Firearm." We presume that the jury understood and followed those instructions, and would not have relied on a street terrorism conviction as one of the predicate offenses. (See, e.g., *People v. Richardson* (2008) 43 Cal.4th 959, 1028 [court assumes jurors are " 'intelligent persons and capable of understanding and correlating all jury instructions which are given' "].)

Moreover, in the context of the entire trial, including the instructions, the evidence, and the arguments of counsel, there is no "reasonable likelihood that the jury misapplied or misconstrued" the court's response to mean jurors could use Robinson's street terrorism conviction as a predicate offense. (*People v. Crew* (2003) 31 Cal.4th 822, 848; *People v. Young* (2005) 34 Cal.4th 1149, 1202 [in assessing probable impact of instruction on jury, courts must consider all of the instructions and arguments of counsel].) As noted above, the jury was instructed, consistent with section 186.22, subdivision (e), that it could rely on *the commission* of various crimes, including carrying loaded firearms. In his closing argument, the prosecutor never mentioned street terrorism, but told the jury, "So for Mr. Robinson's conviction the question is whether he only aided and abetted the defendant by bringing the firearms? Or if he also directly acted and directly committed the crime of possessing the firearm. Right? And when he brought the firearm he was fully in possession

14

of a loaded, not registered to him, firearm.  He committed the offense.  And then the defendant committed the offense as soon as he got it.  Right?"  He further stated, "In the alternative, if you . . . don't find that Mr. Robinson's *conduct in this case* represented a predicate, that you don't think it was gang-related or that I hadn't proven it correctly, then you can look to the 2014 incidents."  (Italics added.)  Under section 186.22, subdivision (e), the prosecution did not have to rely on a conviction, but could argue evidence of Robinson's *conduct* in this case (i.e., carrying a loaded a firearm) constituted the commission of a predicate offense.  (See, e.g., *People v. Garcia* (2014) 224 Cal.App.4th 519, 524 ["Because section 186.22, subdivision (e) contains both the options of 'commission' or 'conviction,' the statute expressly does not require that the offense necessarily result in a conviction."]; *People v. Lara* (2017) 9 Cal.App.5th 296, 331 [jury could consider evidence gang member possessed firearm as " 'commission' " of predicate offense even though he was not convicted of that offense pursuant to his plea agreement]; *People v. Loeun* (1997) 17 Cal.4th 1, 5 [" 'pattern of criminal gang activity' " can be established by evidence of offense with which defendant is charged and proof of another offense on same occasion by a fellow gang member].)

The evidence that the prosecution relied on in its argument to the jury about Robinson was the evidence presented at trial regarding his possession of the firearm, including his DNA on one of the guns, and Anderson's identification of Robinson and testimony that Robinson handed defendant a firearm in video footage prior to the police chase.  Given that the prosecution's argument relied on Robinson's *conduct*, not the street terrorism conviction itself, and the jury instructions did not include street terrorism as a predicate offense, it is not reasonably probable the jury used Robinson's street terrorism conviction as a predicate.

15

Defendant also contends no evidence was presented about the factual basis for Robinson's plea, and that the jury could not adopt a theory of guilt different from that upon which his conviction was based, citing *People v. Gallardo* (2017) 4 Cal.5th 120, 136, and *In re Sakarias* (2005) 35 Cal.4th 140, 156. Those cases, however, are inapposite. In *Gallardo,* our Supreme Court held that a sentencing court could not rely on a preliminary hearing transcript to determine the basis of a defendant's prior conviction in deciding whether to impose an increased sentence under the "Three Strikes" law because that inquiry "invades the jury's province by permitting the court to make disputed findings about 'what a trial showed, or a plea proceeding revealed, about the defendant's underlying conduct.' " (*Gallardo*, at p. 136.) Here, the prosecutor argued to the *jury* that it could rely on Robinson's *conduct* in the same case based on evidence presented at trial. *Sakarias* is likewise unhelpful. There, the high court held the prosecution could not "without a good faith justification, . . . attribute to two defendants, in separate trials, a criminal act only one defendant could have committed." (*Sakarias*, at pp. 155–156.) In this case, there is no evidence the prosecutor sought to convict Robinson and defendant of a crime only one of them could have committed. Indeed, the prosecution's theory of the case was that Robinson and defendant committed their crimes as part of a conspiracy.

Finally, any error in the trial court's response to the jury was harmless beyond a reasonable doubt. (See *People v. Beardslee, supra*, 53 Cal.3d at p. 97 [a violation of § 1138 does not warrant reversal unless prejudice is shown].) Defendant does not argue the jury could not rely on Bolton's and Rauls's 2014 offenses, and no evidence undermining those offenses was presented at trial. (See, e.g., *People v. Concha* (2010) 182 Cal.App.4th 1072, 1089 [court may review entire record to determine whether it is clear beyond

16

a reasonable doubt that a rational jury would have made necessary findings absent instructional error]; *People v. Fiu* (2008) 165 Cal.App.4th 360, 388 [trial court error in instructing jury it could rely on non-enumerated predicate offense was harmless where trial court had taken judicial notice of, and instructed the jury regarding, two other valid predicate offenses].) Accordingly, we conclude defendant has failed to demonstrate prejudicial error.

## B. *Mistrial Motion*

### 1. *Additional Background*

When questioning Officer Anderson on direct examination about the video of the 400 block of 5th Street, the prosecutor asked, "Now do you have an opinion as to where [defendant] is headed after getting out of the Camry?" Defense counsel objected that the question called for speculation. The court responded: "Sustained. He can testify as to what is in that direction, but not where [defendant] is going." The prosecutor said, "Okay. I can rephrase." Defense counsel then objected to the court "characterizing the person in the red jacket as [defendant]." The court replied, "You are correct. The person in the red jacket, my apologies."

Later, outside the presence of the jury, defense counsel moved for a mistrial, "based on the Court referring to the person being accused in this case of evading and possession of a firearm, was identified by the Court as [defendant]." Defense counsel argued, "[T]hat is the contested fact in this case. And it's one thing for the prosecution or the witnesses to say that's [defendant]. It's another for the neutral arbiter to do so. And I think it is so highly prejudicial that that bell can't be unrung." Defense counsel moved for a mistrial based on the violation to defendant's rights under the Fifth, Sixth, and Fourteenth Amendments to the federal Constitution.

17

The prosecutor objected, arguing that the remark "was just a slip of the tongue, really," and required only "an admonishment to the jury just stating that what you say is not . . . a statement of fact. . . . that they can consider. And not to consider it." He asserted a mistrial was unnecessary because defense counsel could still "make the same arguments or cross my witness who made the claim that that is [defendant] in the video."

The trial court responded: "Okay, so I'll note for the record that the context of this was the video that was shot from surveillance video of an individual walking to and from a car. And the witness had identified that individual as [defendant].

"And you are absolutely correct, I should have identified the person as the individual in the particular colored jacket when the issue came up, as opposed to [defendant]. I was just sort of following along with the witness's identification. It's not the chase. It's an in and out of the car prior to the chase occurring. But you are absolutely correct, I should have spoken differently in the way I identified the individual, for the record.

"I . . . don't think it rises to the level of a mistrial. And had this been a video of the chase, I would have absolutely agreed with you. This is prior to, and it's individuals coming and going from a vehicle or vehicles.

"So I'm happy to admonish the jury. Again, as you noted, as you made the objection I corrected it. But I'm happy to admonish them again that that was my misspeaking, if that's a word, and admonish them that any of what I have say or do [sic] is inconsequential, and that they are the finders of fact in this matter."

Defense counsel asked the court to "go a little further in the admonishment" because it was "pretty clear in the video that the person wearing that red Jordan jacket gets in the driver's seat right before the chase

18

begins," and the defense intended to argue that defendant was in the video but was not the person who drove the car and that an "unknown individual who is wearing that red jacket . . . likely drove that car and was involved in this." Defense counsel asked the court to "tell the jury . . . this video is panned out, I can't make out facial features. I cannot identify [defendant]."

The prosecutor then objected that such an admonishment would be the equivalent of "giving [the court's] opinion" and "would be prejudicial the other way." He suggested the court state it "didn't mean to indicate that to the jury," but objected to the court "giving [its] personal opinion as to . . . the state of the evidence."

The court then offered to "say, neutrally say, that I'm not identifying any individual, whether it's [defendant] or anyone else." The court noted, "For a variety of reasons" it could not identify defendant, that it would be inappropriate to give an opinion at all, and said: "So I'm happy to say that I am not making an identification of that individual, that's their job. And I misspoke." Defense counsel asked the court to add: "I misspoke, because the witness had just said it." The court agreed.

In the presence of the jury, the court first apologized, then stated: "I have asked the prosecutor to put up a particular photo that was a still from the video that you were shown when the officer was testifying. The officer identified the individual who's right now in the picture wearing red getting out of a car, as a particular individual. And there was an objection, and then I attached a name to that. I'm not making any identifications here. That's not my role. It is up to you to decide who is in these photos, who is not in these photos. And it's up to you to evaluate the evidence of that. I am not and cannot make any identifications of people who are in that.

19

"So that was my misspeaking, so I apologize for that. And again, it is your decision, as the trier of fact, as the fact finders, to determine who is and who is not in these photographs."

### 2. Analysis

Defendant argues the trial court erred in denying his mistrial motion because the court's identification of defendant as the person who entered the driver's seat of the Accord violated his state and federal due process rights.

A trial court "may make any comment on the evidence and the testimony and credibility of any witness as in its opinion is necessary for the proper determination of the cause." (Cal. Const., art. VI, § 10, 3d par.) Such a comment must " ' "be accurate, temperate, nonargumentative, and scrupulously fair. The trial court may not, in the guise of privileged comment, withdraw material evidence from the jury's consideration, distort the record, expressly or impliedly direct a verdict, or otherwise usurp the jury's ultimate factfinding power." ' " (*People v. Monterroso* (2004) 34 Cal.4th 743, 780.) Under this standard, the court "has 'broad latitude in fair commentary, so long as it does not effectively control the verdict.' [Citation.] 'We determine the propriety of judicial comment on a case-by-case basis.' " (*Ibid.*)

As our Supreme Court has explained, " '[a] trial court should grant a mistrial only when a party's chances of receiving a fair trial have been irreparably damaged . . . .' " (*People v. Schultz* (2020) 10 Cal.5th 623, 673.) " ' "Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions." ' " (*Ibid.*) We review a trial court's denial of a mistrial motion for abuse of discretion. (*Ibid.*)

Here, as the parties and trial court acknowledged, the court should not have identified defendant as the individual in the red Air Jordan jacket. However, it is clear from our review of the record that the court simply misspoke when it directed the prosecutor to rephrase his question and repeated the witness's identification of defendant in the process. The court immediately sustained defense counsel's objection to the misstatement and shortly thereafter gave a lengthy admonition to the jury, clarifying that the court was not in any way making an identification. "We presume that a jury follows the court's admonishments." (*People v. Schultz, supra,* 10 Cal.5th at p. 673.) Although defendant emphasizes the power of a court's words to influence the jury, we presume the jury would have accorded such weight to the court's clear, robust explanation that its statement was inadvertent and in no way to be interpreted as an identification of defendant.

We conclude the trial court did not abuse its discretion in denying the motion for mistrial.

## C. Abstract of Judgment

The Attorney General correctly identifies several errors in the sentencing minute order and abstract of judgment.

As to the minute order, the Attorney General notes the trial court sentenced defendant to a total term of seven years four months, but the sentencing minute order reflects only an aggregate sentence of six years. The minute order also does not reflect the two-year terms the trial court imposed and stayed under section 654 for counts 2, 3, 4, and 5.[4]

The abstract of judgment incorrectly states that defendant was convicted of fleeing a pursuing peace officer while driving recklessly under

---

[4] The minute order does indicate additional orders are attached, but they were not included in the record on appeal.

Penal Code ("PC") section 2800.2.  The correct statute is Vehicle Code section 2800.2.

## III.  DISPOSITION

The judgment is affirmed.  The trial court is directed to correct the sentencing minute order, and to prepare an amended abstract of judgment and forward a certified copy to the Department of Corrections and Rehabilitation.

MARGULIES, J.

WE CONCUR:

HUMES, P. J.

BANKE, J.

A160119
*People v. Proctor*

23